LUNDBERG et ux. v. MISSOURI–KANSAS–TEXAS R. CO. OF TEXAS.

No. 2915.

Court of Civil Appeals of Texas. Waco.

June 15, 1950.

Rehearing Denied Oct. 11, 1950.

W. R. Sessions and Templeton & Gauen, all of Dallas, Paul Massey, Fort Worth, for appellants.

Naman, Howell & Boswell, Waco, Cureton & Cureton, Meridian, G. H. Penland, Dallas, for appellee.

LESTER, Chief Justice.

This suit was brought by Mr. and Mrs. Hugh Lundberg, parents of Wilburn and Billy Joe Lundberg, of the ages of twenty-six and twenty years, respectively, who sustained fatal injuries on December 5, 1948, when the automobile in which they were riding collided with a boxcar blocking the crossing on a public highway in the city of Walnut Springs, Texas.

They predicate their cause of action upon an extra hazardous crossing and the blocking of said crossing for more than five minutes. They alleged the Railroad Company was negligent in not maintaining a light or signal, flagman or brakeman with a lantern at said crossing, and in blocking the crossing for more than five minutes.

The parties will be designated as they appeared in the court below.

The trial court submitted the case upon special issues and the jury found that the following acts were negligence and a proximate cause of the collision: (1) blocking the crossing for a period of more than five minutes prior to the collision; (2) in not breaking the train and keeping said crossing clear; (3) the act of blocking said crossing in the night time without putting out lights to warn persons lawfully using said highway; (4) the defendant did not have a flagman to warn persons lawfully using said highway; and (5) that the defendant failed to have a brakeman with a lantern at said crossing on the occasion in question. The jury also found that Billy Joe was guilty of contributory negligence in driving at a high and dangerous rate of speed, in driving at a rate of speed in excess of 30 miles per hour within the built-up portion of the city of Walnut Springs; failing to stop the car before the collision, and failing to have his car under control; but the jury acquitted Wilburn of all acts of negligence submitted.

Upon receipt of the verdict the defendant filed a motion for judgment non obstante veredicto, which the court, upon proper notice and hearing, granted, upon the grounds that there was no evidence that the crossing was an extra hazardous crossing and that there was no evidence that the

train blocked the crossing more than five minutes prior to the collision.

The undisputed evidence shows that the collision occurred on the night of December 5, 1948, between 11:00 and 12:00 P.M. in the city limits of Walnut Springs, where the railroad track crosses highway No. 144. The train had stopped to take on water, as was its usual custom, and one of the box cars had the crossing blocked. The street leading to the crossing from the north is 60 ft. in width from curb to curb and paved to a width of about 25 feet and it is practically straight and level and unobstructed for several blocks. A street light is located some 204 ft. from the crossing on the north of the track. There was a standard railroad crossing sign which was clearly visible to everyone approaching from the north on the night of the catastrophe. The evidence is to the effect that the night was dark and cloudy but there was no fog, mist or rain. There is a street intersecting highway 144 some block and a half or two blocks from the crossing. The train was made up with engine, caboose and a string of ordinary box cars. These young men were quite familiar with the crossing, being reared within a few miles and had crossed it many times.

Pat Harris, a witness for the plaintiffs, testified that he approached the crossing from the north a few minutes before the collision and drove up and stopped on the righthand side of the highway to wait until the crossing was cleared. When he first discovered the train it was in motion but had stopped at the time he reached the crossing. After he stopped from one to three minutes a pick-up drove up and stopped behind him some few feet. He said the pick-up had clearance lights which were burning; that he did not notice whether the headlights on the pick-up were burning or not; that he left his lights on; that they were not as bright as they could have been for the reason that he had his lights connected with the generator; that after the pick-up stopped behind his car he heard the Lundberg car as it approached the corner and entered into highway 144.

W. L. Schomers testified that he was the driver of the pick-up that stopped behind the Harris car. He said it was a 1947 Chevrolet pick-up which had seven lights over the cab, two tail-lights and two headlights; that the seven lights on the cab were four yellow lights on each corner and three red lights across the middle; that anyone approaching from the rear would see the three red lights in the center of the top of the cab and one on each side of the top of the cab and then the two red tail lights in the usual place on the pick-up truck; that all of these lights were burning and that his headlights were also burning; that he drove up some six feet behind the Harris car and stopped on the right-hand side about 40 feet from the box car, and remained there for the crossing to clear with all his lights burning; that he saw the train standing across the highway when he was within a block of the crossing; that while he was parked there he heard a car coming that attracted his attention; that it sounded like its muffler was bad or it was going at a fast rate of speed; that there was a roar of the motor; that as the car passed him it was running between 40 and 45 miles per hour and as it got alongside of him it pulled off the pavement and collided with the box-car.

Mrs. Schomers, who was in the pick-up with her husband, estimated the rate of speed of the car at from forty to forty-five miles per hour.

Plaintiffs' first proposition is: "The trial court erred in refusing opinion evidence offered by plaintiffs as to the extra hazardous condition of the crossing at Walnut Springs, Texas."

Plaintiffs placed W. H. Brister, an undertaker, upon the stand and proved by him that he drove his ambulance; that he drove under all conditions; that he had to drive at high rates of speed through various traffic conditions; that he had occasion to cross numerous railroad tracks and that he was familiar with this particular crossing, and propounded to the witness the following questions:

"Q. You have, of course, to go back and forth between Walnut Springs and Meridian, do you not? A. Yes, most every day.

"Q. And in doing so you of course cross this crossing on highway 144. Do you cross at night time as well as day time? A. Yes, we cross it at most all hours.

"Q. Good weather and in bad weather? A. Yes.

"Q. Dark and on moonlight nights, all kinds of weather conditions? A. Yes.

"Q. Do you have occasion on various occasions to drive at high rates of speed? A. Yes.

"Q. And you have, of course, to drive at high rates of speed through various traffic conditions, isn't that right? A. More or less.

"Q. I will ask you what your opinion is with reference to whether or not this is an extra hazardous or dangerous crossing?"

Which was not answered because the court sustained the defendant's objection.

The witness Wreay testified:

"Q. Do you have occasion to drive across that crossing very often? A. Yes sir.

"Q. Did you ever have any difficulty in picking up objects as you approach that crossing on a dark night?" Not answered, objection sustained.

As to plaintiffs' attempt to prove other accidents and near accidents, the circumstances or conditions under which they occurred, we are left completely in the dark as no attempt was made to establish such facts, nor does the record show what the answers of the witnesses would have been if permitted to answer the questions. However, the court did tell plaintiffs' counsel: "On Mr. Brister and the reputation of the crossing if you have any evidence that there were previous accidents at this crossing and that such accidents were communicated to the railroad company and they had knowledge or notice of it that would tend to shed light on the question of whether or not it was an extra hazardous crossing I will admit it." But counsel did not pursue the matter further.

We are of the opinion that the ruling made by the trial court was correct, because evidence to such effect would have contradicted the undisputed physical facts surrounding the crossing shown to exist on the occasion in question as it was approached from the north. The evidence as to the condition of the crossing on the south is very meager, except that one witness testified the crossing was clear and unobstructed on both sides of the railroad track for a distance of at least 50 feet, but this witness, as the other witnesses, testified that the north side was clear and unobstructed for quite some distance. So if the conditions on the south side of the track were such that rendered the crossing an extra hazardous one at night time, it becomes immaterial here, because of the undisputed evidence as to the condition of it on the north side which the young men approached and ran into the side of the train with such force that almost completely demolished the automobile, while a car and a pick-up truck were parked in close proximity with their lights shining in the direction of the train. See Annotation in Texas Law Review, Vol. 28, pages 76–89, where it is stated: "It is true that in many cases the dangerous character of the crossing may not be an issue in the case for the reason that the Court is willing to rule as a matter of law that the crossing is not extraordinarily dangerous. Exclusion of the plaintiff's safety history evidence in the lower court has been affirmed on this ground. Certainly the plaintiff should be required to have some qualitative or descriptive theory of danger before he is allowed to prove safety history evidence. The probity of safety history evidence on dangerous character of the crossing lies in a statistical inference, the basis of which is the proposition that if a number of people have been injured at the crossing under the same conditions, then there is likelihood that the crossing is dangerous when those conditions exist. Such proof at best has obvious limitations. Proof that others have been injured at a crossing where apparently there are no obstructions to view and no conditions existing that tend to make it difficult to hear or

see the train is not convincing enough to be worthwhile."

Under certain conditions such testimony would be admissible, as was held in the case of Missouri, K. & T. Ry. Co. of Texas v. Long, Tex.Civ.App., 23 S.W.2d 401, and City of Fort Worth v. Lee, 143 Tex. 551, 186 S.W.2d 954, 159 A.L.R. 125, but none of the conditions established in these two cases are present in the case at bar.

Plaintiffs complain of the action of the court in refusing to submit to the jury their requested special issue of extra hazardous crossing, and in finding in the judgment that there was no evidence that the crossing was an extra hazardous one.

■ The crossing in question was an extra hazardous one if the conditions surrounding it were so peculiarly dangerous that a person of ordinary prudence could not use the same with safety unless the defendant employed extraordinary means to give warning of the presence of its train standing across the highway. Missouri, K. & T. Ry. Co. v. Long, Tex.Com.App., 299 S.W. 854; Missouri, K. & T. Ry. Co. v. MaGee, 92 Tex. 616, 50 S.W. 1013; Gillham v. St. Louis S. W. Ry. Co., Tex.Civ. App., 241 S.W. 512. Unless the conditions surrounding the crossing on the occasion inquired about rendered it more than ordinarily hazardous, the defendant was not required to take extraordinary means in protecting it. Walker v. Texas & N. O. R. Co., Tex.Civ.App., 150 S.W.2d 853; Texas & N. O. Ry. Co. v. Beard, Tex.Civ.App., 91 S.W.2d 1080 (writ ref.); Texas & N. O. Ry. Co. v. Compton, 135 Tex. 7, 136 S.W.2d 1113; Tisdale et al. v. Panhandle & S. F. Ry. Co., Tex.Com.App., 228 S.W. 133, 16 A.L.R. 1264; Texas & N. O. R. Co. v. Stratton, Tex.Civ.App., 74 S.W.2d 741 (writ. ref.); Attebery et al. v. Henwood, Tex.Civ.App., 177 S.W.2d 95 (writ ref. w. m.).

■ From the evidence, can it be said that the conditions surrounding the crossing as one approached it from the north on this particular occasion were such that a person driving at a lawful rate of speed, with good lights and brakes and otherwise exercising ordinary care, could not use the same with safety? We think not. The undisputed evidence shows that the car in which the young men were riding had perfect lights and good brakes. The night was dark but there was no fog, mist or rain. Schomers testified that he saw the train standing across the crossing when he was a block from the same. From the facts heretofore set out, we are of the opinion that there is no evidence of any probative force establishing the crossing as extra hazardous, and it was not error upon the part of the trial court in refusing to submit such issue.

Plaintiffs also complain of the trial court's action in finding that there was no evidence that the train blocked the crossing more than five minutes prior to the collision in question.

Article 787, Vernon's Penal Code, provides: "Any officer, agent, servant or receiver of any railway corporation who wilfully obstructs for more than five minutes at any one time any street, railway crossing or public highway by permitting their train to stand on or across such crossing, shall be fined not less than five nor more than one hundred dollars."

■ If there was any evidence in the record to raise the issue, then it was error upon the part of the trial court in granting the defendant's motion and rendering judgment for it. Schumaker v. Whiteside-Appling Motor Co., Tex.Civ.App., 144 S.W.2d 944; Walker v. Texas & N. O. R. Co., Tex.Civ.App., 150 S.W.2d 853. The plaintiffs contend the testimony of the witnesses Brister, Harris, Blitch, the conductor, and Hammett, the head brakeman, creates such issue. Undertaker Brister's testimony on the question, on direct examination, was that he lived about a block from where the train takes on water, and from three to four blocks from the depot; that he was at home that night and heard the train down there something after 11:00 o'clock P. M.; that he did not look at his watch as he had no occasion to do so. He further testified as follows:

"Q. Do you know about how long it was from the time you first heard the train until someone called you? A. It wasn't very long; I would say ten or fifteen minutes.

"Q. Who called you? A. A Mr. Allen, who at that time was night watchman at Walnut Springs, a Mr. C. C. Allen.

"Q. Did you hear the collision? A. No sir, I did not.

"Q. You don't know how long it was from the time of the collision there until Mr. Allen got to you? A. No sir, I do not."

His testimony on cross-examination was:

"Q. Now, you were not paying any particular attention to time then to see how long it was going to be there to take on water, anything like that? A. No sir, I just come in, and heard the train whistle down there.

"Q. You say you heard the train whistle, could you tell about where it was when you heard the whistle as you came in? A. I think the engine was more or less behind our house down between the water tower and depot.

"Q. Was that as coming in to get water and stop it whistled? A. I don't know, I was in the house, and heard a train down there behind the house.

"Q. You don't know whether it was whistling to come in or whistling to leave, or what? A. No sir, I would not know about that.

"Q. At any rate you heard the whistle and some few minutes—I believe you said some ten minutes or so later—someone came—a Mr. Allen, to notify you of an accident? A. That is right.

"Q. Now, you would not be positive as to that time, that is just a rough approximation, isn't it Mr. Brister? A. Well, I would say it was after eleven and before twelve when he came after me.

"Q. I mean it might have been, as far as you known it could have been five minutes, or ten or fifteen minutes after you heard the train before someone came and told you about an accident? A. It would not have been over fifteen minutes, because I had not got to bed when I heard it.

"Q. And it might have been five minutes? A. I believe it was longer than five minutes.

"Q. From the time you heard the whistle until Mr. Allen came up? A. Yes sir.

"Q. Well, you are not trying to tell the jury that that train stood over the crossing more than five minutes before this accident; you did not time it and you don't know? A. No sir.

Pat Harris' testimony with reference to approaching the crossing is as follows:

"Q. And you saw this train over the crossing and pulled up to wait for it to pass? A. I heard it really, I knew it was there.

"Q. You heard it, what did you hear? A. I heard the train blow its whistle.

"Q. Was it moving at that time? A. Yes sir.

"Q. And was it over the crossing as you came up to the crossing? A. Yes sir.

"Q. And you were the only car on that side at that time, is that right? A. I pulled up first and then the pick-up behind me.

"Q. How long had the pick-up been setting there before this car struck the train? A. Well, I don't really know.

"Q. Well, can you give an approximation with any degree of accuracy as to whether it was a second, a minute, two or five minutes? A. I would say I had been setting there four or five minutes, but I don't know about the pick-up.

"Q. Is that your best approximation of it? A. Yes, that is the best.

"Q. In other words that is not an accurate time but something that could be a little more or a little less, am I right in that? A. Yes, I had no watch and wasn't paying any attention to the time."

He testified on re-cross examination:

"Q. As I understand it, your best estimate is that you had been standing there four or five minutes when this accident happened? A. Yes."

Joe Blitch, the conductor, a witness for the defendant, testified on direct examination as follows:

"Q. What were you doing there? A. I was conductor on the train and we were taking water.

"Q. What time did you arrive at that crossing to stop for water that night? A. We arrived at 11:35 P. M.

"Q. Did you keep a record of that? A. I put it down at the time we stopped.

"Q. Do you have that record with you? A. I do.

"Q. Can you refer to the record, Mr. Blitch; have you referred to the record to verify that 11:35 which is the time you say you arrived there? A. 11:35 is correct.

"Q. You had been there how long when that happened (referring to the accident)? A. We pulled in there, spotted under the water tank at 11:35 and approximately 11:38, right at that time, the car struck the train.

"Q. From 11:35 to 11:38 you had been there then three or four minutes? A. About three or four minutes to be exact."

On cross-examination the following occurred:

"Q. I believe when we recessed I was asking you about the time matter? A. Yes.

"Q. Did you find your records? A. Well, I believe I had my records here now.

"Q. Did you find anything on it? (I'll come over here, Mr. Blitch.) A. Here is where we arrived at Walnut Springs, at 11:25.

"Q. 11:25 P. M. A. Yes, 11:35.

"Q. And time of accident was 11:38? (The Reporter asked witness to repeat times) A. 11:35 P. M. arrived and time of accident 11:38.

"Q. That is on line 16, is that right? He made the statement of both times, 11:25 and 11:35; I would like the record to show it. A. 11:35 is what I said, that is the time.

"Q. He said 11:25 and corrected himself, his testimony now is 11:35. A. I said 11:35 all the time.

"Q. Can you point out the other? A. What is it now you want?

"Q. Your memorandum of when the car hit the train. A. That is the time of the accident right here, arrived Walnut Springs 11:35, time of accident 11:38.

"Q. Where does it say 11:38? A. Right up there, and there is the car license all written in there at the time of the accident, I knew I made a record some place.

"Q. Before today have you ever seen me? A. Yes, I have seen you.

"Q. Where was it you saw me? A. In my home.

"Q. In DeLeon, Texas, is that right? A. Yes.

"Q. And when was the first time you saw me? A. Well, I reckon down there at the station.

"Q. When was it, two or three weeks ago? A. Something like that.

"Q. Now, on that occasion didn't I ask you how long you were stopped at Walnut Springs that night? A. I believe you did.

"Q. Didn't you answer me on that occasion some six or eight minutes, didn't remember for sure but would have to look at your book? A. Well, I guess I told you all we had to do was take water.

"Q. Didn't you tell me you were there some six or eight minutes? A. I said it could have been maybe that long altogether, but I had the record in the book. Also told you all we had to do was take water there on the tender."

Mr. Hammett testified as follows:

"Q. Where were you when the train stopped there that night, Mr. Hammett? A. I was on the caboose when the train stopped.

"Q. What position did you occupy? A. I was the head brakeman on the train.

"Q. What duties did you have to perform when you got there and the train stopped? A. Nothing, only walk from the caboose to the engine.

"Q. Did you start walking as soon as the train stopped or did you wait? A. Just as soon as the train stopped.

"Q. Did you keep walking until the time the accident happened or did you stop? A. Kept walking until the time of the accident.

"Q. Did you hear the accident, the impact of the collision? A. Yes sir.

"Q. Were you still walking at that time towards the front end? A. Yes.

"Q. How far were you from the front when you heard the impact of the collision? A. I would say around six car lengths.

"Q. How many car lengths would that mean you had walked up until you heard the impact? A. About twenty-two car lengths.

"Q. Do you know how many car lengths you walk in a minute? A. Yes sir.

"Q. How many? A. Around eight, just average cars.

"Q. How long then would you say it was from the time this train stopped at that crossing before this accident occurred? A. Well, I would say around three minutes."

Weighing the evidence in the light most favorable for the plaintiffs, and indulging all reasonable inferences and disregarding all adverse evidence, we are of the opinion that there is no evidence that the train had been standing over said crossing more than five minutes prior to the collision.

The judgment of the trial court is affirmed.

HALE, J., concurs.

TIREY, J., took no part in the consideration and disposition of this appeal.