Pablo MUNIZ et al., Appellants,

v.

PANHANDLE & SANTA FE RAILWAY
COMPANY, Appellee.

No. 6529.

Court of Civil Appeals of Texas.

Amarillo.

Dec. 19, 1955.

Rehearing Denied Jan. 23, 1956.

·Shaw & Daniel, Casey Charness, Lubbock, for appellants.

Lewis Jeffrey, Amarillo, McWhorter, Cobb & Johnson, Lubbock, for appellee.

PITTS, Chief Justice.

This appeal is from a single judgment rendered in three separate suits filed in the trial court and consolidated for trial by the trial court. The cases each arose out of the same collision which occurred between a Panhandle & Santa Fe Railway freight train and a 1950 Chevrolet automobile about 4:30 o'clock p. m. on August 22, 1953, at the intersection of the railroad track with Baylor Street in the north edge of the City of Lubbock while the train was proceeding south and the automobile was proceeding east on Baylor Street. There were three occupants in the automobile at the time of the collision, namely, Pascual Muniz, age 27 years, and his brother, Gilbert Muniz, age 19 years, and Rual Cervantes, age 20 years, and only Gilbert Muniz survived the collision, and he was injured, the other two named occupants having been killed as a result thereof. The proper surviving relatives of the two who were killed and Pablo Muniz, the father of Gilbert Muniz, as next friend of him as a minor, all as appellants herein, sued appellee, Panhandle & Santa Fe Railway Company, for a total sum of $307,500, as a result of alleged damages by reason of the collision.

The cases were jointly tried to a jury beginning December 6, 1954, but an instructed verdict against appellants and for appellee resulted after the evidence closed and judgment was accordingly rendered, from which appellants have perfected an appeal. Appellants present three points of error contending that negligence, which proximately caused the damages, was shown on the part of appellee's agents; that the evidence raised discovered peril issues; and that those two occupants of the automobile not driving were passengers therein for whose injuries appellee is liable because of the negligence of its agents, which negligence was a proximate cause of the damages claimed.

Appellants did not plead or clearly establish by the evidence who was driving the automobile at the time of the collision but we do not consider such a matter a material question in view of the disposition being made of the appeal. Appellants did plead that appellee's agents were operating the train at an excessive rate of speed without ringing the bell or blowing the whistle for the crossing at the time of the collision and that appellee's railroad crossing where the collision occurred was an extra-hazardous crossing without having adequate warning signals placed there in addition to the standard railroad cross-arm sign. Appellee joined issue with appellants in the matters pleaded and further pleaded special exceptions and a general plea of negligence as a matter of law on the part of all the occupants of the automobile but especially the driver thereof, which negligence was a proximate cause of the injuries that resulted in the alleged damages.

The record reveals that the Muniz brothers left their father's farm near Shallowater about 2:00 o'clock p. m. on the day of the collision in their father's automobile. Their mother testified that Pascual was driving when they left the farm. They drove to Shallowater and from there to Lubbock, a distance of about 12 miles. Little information is given us about where they went or what happened between the time they left the farm and the time of the collision two and one-half hours later. It seems Gilbert Muniz had a lapse of memory for several days as a result of his injuries received at the collision and some of his testimony is vague about what happened during the two and one-half hours immediately before the collision occurred. He testified that his older brother, Pascual, was going to Lubbock on that occasion to make some payments to Mr. Needles and that he went along with him; that they stopped at a filling station at some place and changed a tire; that they picked up Rual Cervantes at some place before the

collision occurred but he did not know where; that Rual Cervantes had been drinking and was under the influence of intoxicants; that he believed all three of them were riding in the front seat when the collision occurred and he believed Pascual was driving at the time of the collision but he was not positive about either. Further testimony of Gilbert will be referred to later herein. The record further reveals that the freight train composed of 33 box cars and a steam engine was running from Amarillo to Slaton and the collision occurred soon after the train reached the north edge of Lubbock. The engineer was riding in a seat on the right-hand side of the engine cab with a window at his right and a window in front of him, giving him a view of the right-of-way in front of him through the front window and a view out of his window on the right. The engineer was charged with the duties of operating the train, observing designated signs, traffic signals and limited speed rates, ringing the bell and blowing the whistle at road and street crossings, controlling the cab brakes if and when their use may be needed and performing other duties in connection with operating a train. At the time of the collision the fireman and head brakeman were also riding in the engine cab on the left-hand side thereof across from the engineer with the fireman seated in front of the head brakeman. Neither of them saw the approaching automobile on the occasion in question and knew nothing about the collision until the engineer put on the emergency brakes and told them an automobile had hit the side of the engine. Avenue Q extended north and south immediately along the west side of the railroad and likewise intersected and crossed Baylor Street immediately west of the railroad-Baylor Street intersection. Baylor Street was paved but Avenue Q was not paved. Immediately northwest of the intersection of Baylor Street and Avenue Q was located a small neighborhood grocery store facing south and adjacent to Baylor Street. It bore a sign as "Save A Nickel" store and was known as such. There is evidence to the effect that the said store is located 128 feet west and a little north from the point of collision of the automobile with the train. There is likewise evidence to the effect that Avenue Q is about 32 feet wide, is about 52 feet west of the railroad and that it is about 40 feet from Avenue Q to the Save A Nickel store, making a total of 124 feet from the point of the collision to the store. The automobile with the three occupants therein stopped in front of the Save A Nickel store just before the collision occurred when Gilbert Muniz went in the store and purchased some cigarettes and chewing gum. While the automobile was parked in front of the said store the view of its occupants was obstructed by the store building from the north part of the railroad from which direction the train was approaching some distance down the track. Likewise the view of the train operators was obstructed at such time from the automobile by the store building. When Gilbert Muniz returned to the automobile and there joined the other two occupants, they immediately drove east some 130 feet on Baylor Street, across Avenue Q, to the point of the collision with the moving train. There are photographs in evidence made by an experienced photographer correctly reflecting, according to the evidence, the existing physical conditions surrounding the intersection at the point of collision, as well as the point of contact between the automobile and the train, and such photographs were identified by witnesses who used them in giving testimony in connection with the collision. According to the evidence, when the automobile left the store and cleared the southeast corner of the same, it was then more than 100 feet across Avenue Q to the place of the collision and there was nothing, looking to the north, between the occupants of the automobile and the train to obstruct the view of the said occupants from the approaching train and surely the driver of the automobile had not gained enough speed from the stop made at the store to lose control of the automobile. There was nothing while they traveled a distance of more than 100 feet to prevent the occupants of the automobile from looking north through the open spaces down

Avenue Q and seeing the approaching train. At the point of intersection of the railroad and Baylor Street the surface of the pavement around the train tracks is level with clear vision ahead. The train came up a slight rise as it approached the intersection and there was a small embankment immediately north of the intersection along the west side of the railroad tracks, but at its highest place for only a short distance the embankment was only a few feet high and hid no more than the wheels and the running gear under the box cars and the lower part of the engine that made up the train. The remainder of the train at the point of embankment was plainly visible and practically all of the train was visible for a distance of a quarter of a mile or further north of the point of collision.

Gilbert Muniz testified that they parked the automobile in front of the Save A Nickel store for him to purchase the cigarettes and chewing gum; that he saw the railroad crossing when they stopped at the store; that as he stepped around the corner of the grocery store he could see north down the railroad track to the pumice block factory or concrete block factory which shows in the photographs to be on the east side of the railroad and other evidence reveals that it is a quarter of a mile or further from the point of collision. Gilbert Muniz further testified that both he and his brother, Pascual, had been down Baylor Street and had crossed the railroad crossing many times and knew the railroad track had trains running over it; that he did not see the train on that occasion and did not hear a whistle or a bell ringing but he would have probably been more observing if he had been driving. He further testified that he did not remember being hit by the train.

Appellants' witness, Tony Carrasco, testified that he was driving his automobile alone on Avenue Q about 25 miles per hour going south along the west side of the railroad and approaching the intersection of Avenue Q and Baylor Street with the intention of turning east there and crossing the intersection of Baylor Street and

the railroad when he saw the Muniz automobile pass the corner of the Save A Nickel grocery store going east on Baylor Street at a rate of 15 or 20 miles per hour but at no time did the automobile attempt to stop before the collision with the train occurred; that the train passed him while he was about the middle of the block immediately north of the point of collision; that he heard the train whistle about the concrete block factory, which is shown also to be the pumice block factory, about one-fourth mile from the point of the collision and that he heard the train bell ringing also but he did not remember whether or not the bell was ringing when the train passed him on Avenue Q; that he did not hear the train whistle after he saw the automobile; that the automobile apparently swerved a little to its right immediately before the collision; that he saw one occupant in the back seat of the automobile.

Appellants' witness, Julian E. Soto, who operated the grocery store, testified that he often heard passing trains whistle and ring the bell but on the occasion in question he was inside his store selling some candy to some children when the train passed and did not hear a whistle or a bell ring.

The train engineer, John Edward Ecker, testified at the request of appellants, for which reason there is some controversy about whether or not appellants are bound by his testimony. But we do not consider this a material question because his testimony concerning material matters was not controverted and was strongly corroborated either by other oral testimony or by the physical facts or both. He testified that as the train approached Lubbock, he shut off the throttle some two miles before reaching the point of collision, slowed the train down to 25 or 30 miles per hour, observed the whistle board about 1,300 feet from the intersection where the collision occurred, started the automatic bell to ringing one and one-half miles from the point of collision and it was ringing continuously until the collision occurred and continued to ring after the collision occurred; that he was observing both the view out his front window and his side window but he had mo-

mentarily looked ahead and did not see the approaching automobile until he glanced to his right and the automobile was then within 40 or 50 feet of the train, probably 50 feet, approaching at a high rate of speed; that he had been constantly blowing the whistle since he passed the whistle board 1,300 feet from the point of collision but released it as soon as he saw the approaching automobile was going to hit the side of his engine and applied the emergency brakes as quickly as he possibly could and made a good train stop; that he applied the emergency brakes as soon as he saw the automobile was not going to stop; that the automobile moved so speedily and the collision occurred so quickly he had little time to do anything; that the automobile seemed to swerve a little to the driver's right or to the south immediately before the contact was made and there appeared marks on the south edge of the pavement and on the ground where the automobile appeared to have been dragged by the train; that the automobile hit the right side of the train engine near the front end and actually collided head on with the pilot beam and the main cylinder head, knocking the cylinder cock loose at the bottom of the cylinder; that the automobile did not hit the pilot or "cow catcher" on the front of the train; that there were no marks on the pilot showing the automobile hit it; that there existed the usual cross-bar marker at the railroad crossing where the collision occurred as is reflected by the photographs in evidence. This latter testimony is corroborated by photographs showing the cross-bar and the point of contact to be the pilot beam and the main cylinder head and other photographs showing the demolished front end of the automobile. Other witnesses corroborated the testimony of the engineer about the point of contact of the automobile with the train. The testimony of the train fireman, Sammie Angle, and head brakeman, Herman Isbell, fully corroborated the testimony of the engineer concerning the giving of signals, the rate of speed, the application of the emergency brakes and the good train stop made immediately after the collision occurred.

Several witnesses speculated about the speed of the train but there was a mechanical device connected with the train speedometer and completely sealed in the front end of the cab or about the engine which revealed conclusively as recorded on a speed tape the rate of speed the train made from the time it left the shops in Slaton until it returned, and it likewise showed any sudden stops made. Such was not accessible to the train crew or anybody except the mechanic at the train shops who sealed the device in its proper place before the train left Slaton and who removed it therefrom after it returned to Slaton. All parties introduced the speed tape in evidence and examined the mechanic, Cletus Heinrich, as a witness who sealed the said device in the engine of the train in question before it left for Amarillo and removed the same when the train returned to Slaton. The witness explained the usage of the speed tape and showed that it revealed that the train slowed down to 48 miles per hour one mile before the train reached the point of collision; that thereafter the train continued to slow down until it was being operated at a speed rate of 30 miles per hour at the time of the collision, at which point it showed a quick stop after the train moved more slowly to 20 miles per hour, then 15 miles per hour and finally stopped. All parties having introduced the speed tape and having fully examined the mechanical witness concerning rates it correctly revealed are bound by the reasonable 30 mile speed rate it reflected the train was travelling at the time of the collision.

We have failed to find in the record before us any explanation comparable with reason why the driver of the automobile did not see the train with which he collided in time to avoid the collision. The evidence reveals that the Muniz brothers were acquainted with the railroad crossing, knew trains ran along there and were familiar with conditions at and near the crossing. A fellow with knowledge of a railroad crossing is charged with knowledge of existing dangers there by reason of moving trains. Cross v. Wichita Falls & S. R. Co., Tex.Civ.App., 140 S.W.

2d 567; Robinson v. Houston Belt & Terminal R. Co., Tex.Civ.App., 23 S.W.2d 894. The oral testimony and the several photographs in evidence reveal that the driver of the automobile and the occupants with him all had a clear view of an approaching train as they proceeded toward the crossing where the collision occurred and that the train was visible to them for more than 100 feet as they started the automobile in front of the grocery store and moved across Avenue Q and into the moving train. The only conclusion we can reach is that the driver drove into the train without exercising any care for his own safety or the safety of the other occupants. There are no circumstances shown which would excuse the driver and the other occupants from seeing the approaching train. They knew of the crossing and drove into the train without stopping or reducing their speed rate. It is admitted that they did not stop. They must have known that a moving train could not be stopped during the brief time it would take them to drive a little more than 100 feet from in front of the grocery store to the point of collision. To us the cause of the tragedy must be obvious. Based upon the facts and circumstances here presented it reasonably appears that the driver of the automobile in question must have thought he could beat the train across the intersection and tried to do so but must have misjudged his opportunity to do so in some manner and failed to make it, which failure was the sole proximate cause of the collision that resulted in the injuries of the parties and the damages claimed by appellants. It has been consistently held by the courts of Texas that railway trains should be accorded the right of precedence at a point where a train crosses a highway or street. San Antonio & A. P. R. Co. v. Singletary, Tex.Civ.App., 251 S.W. 325; Baker v. Collins, Tex.Civ.App., 199 S.W. 519. Of course train operators are required to use reasonable care and prudence at such crossings.

■■ The burden was upon appellants to offer evidence raising fact issues concerning one or more of their alleged acts of negligence of appellee's agents. Viewing the evidence and circumstances in a light most favorable to appellants' claims, the evidence introduced by appellants still leaves the issues of appellee's negligence at the very most within the realm of speculation and conjecture and we think the trial court was justified in so finding and concluding. Texas & N. O. R. Co. v. Brannen, 140 Tex. 52, 166 S.W.2d 112, 113; Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059.

■ In the case of Turner v. Texas Co., 138 Tex. 380, 159 S.W.2d 112, 115, the court sets out the essential elements of the doctrine of discovered peril in the following language:

"'(1) The exposed condition brought about by the negligence of the plaintiff; (2) the actual discovery by defendants' agents of his perilous situation in time to have averted—by the use of all the means at their command, commensurate with their own safety—injury to him; and (3) the failure thereafter to use such means.'"

In the case at bar after discovering and realizing that the automobile was in or was about to enter a position of peril the train engineer was under the duty during that very brief period of time before the crash of exercising reasonable care in the use of all means at his command, consistent with the safety of himself and others on the train, to avoid the head-on collision of the automobile with the side of the train engine. In the case of Parks v. Airline Motor Coaches, Inc., 145 Tex. 44, 193 S.W. 2d 967, 969, the court held that the rule allowing recovery of damages under the doctrine of discovered peril is exacting and further held that the sole question to be determined in such a matter is whether or not there is evidence that the driver (or in this case the engineer) had actually discovered the perilous position of the other party in time to avoid the collision, by the use of all the means at his command, consistent with the safety of himself and others with him. The court there further held that the burden was upon the plaintiff to

establish such facts. If this is not done, no basis for recovery has been established. In the case at bar we are faced with the question of whether or not appellants offered sufficient evidence to even raise an issue that the train engineer failed to use all the means at his command to avoid the collision after he discovered the perilous position of the driver of the automobile 50 feet away headed into the side of the engine. We believe according to the record before us that appellants did not do so or even raise an inference of such. Schuhmacher Co. v. Posey, 147 Tex. 392, 215 S.W.2d 880. We think the contrary has been conclusively shown by the evidence heard.

Concerning the question of a hazardous crossing, it is common knowledge and has been many times judicially recognized that every railroad crossing in use is a place of danger. Yet the common law and statutory duty of a railroad in Texas with respect to an ordinary crossing is no greater than to provide and maintain thereat one crossing sign or signal of the type prescribed by statute, Vernon's Ann. Civ.St. Article 6370, which kind of sign was conclusively proven to be present at the crossing in question and at the time in question. A railroad crossing is not extra-hazardous unless it is so unusually and peculiarly dangerous that prudent persons, in the exercise of ordinary care, could not use it with safety without extraordinary means, over and above the usual sign or signal, having been there provided to warn the approaching travelers and protect them from danger. By an unbroken line of authorities the rule has been well established in Texas that a railroad is under no obligation to provide extraordinary means to warn persons approaching its crossings or intersections with public roads, streets and highways unless the said crossing or intersection is more than ordinarily hazardous. St. Louis Southwestern R. Co. of Texas v. Barr, Tex.Civ.App., 148 S.W.2d 924; Lundberg v. Missouri-Kansas-Texas R. Co. of Texas, Tex.Civ.App., 232 S.W.2d 879; Thompson v. St. Louis Southwestern R. Co. of Texas, Tex.Civ.App., 55 S.W.2d

1084; Robinson v. Houston Belt & Terminal R. Co., Tex.Civ.App., 23 S.W.2d 894; Missouri, K. & T. Ry. Co. of Texas v. Magee, 92 Tex. 616, 50 S.W. 1013.

Before any higher duty attaches on the part of the railroad, the burden is upon him who complains to establish by competent evidence that the railroad crossing is attended by such unusual or extraordinary dangers as to make its use hazardous to a prudent person in the exercise of ordinary care unless extra precautions, more than the usual crossing sign, are provided for his safety.

In the case at bar we are faced with the question of whether or not appellants offered sufficient evidence to raise an issue concerning the claim that the railroad crossing in question was an extra-hazardous crossing under the rules of law cited. The evidence reveals that approaching trains from the south at the said crossing are as visible as they are from the north and probably even more visible. In our opinion the oral testimony, together with the photographs, offered failed to raise such an issue but on the contrary the evidence conclusively established that the said crossing is not an extra-hazardous crossing.

Appellee contends that the driver of the automobile was guilty of contributory negligence as a matter of law by reason of his failure to stop at the railroad crossing as required by law. On the occasion in question when the driver of the automobile was only a short distance from the railroad crossing the evidence conclusively reveals that a moving train was approaching the crossing within 1,500 feet of the same with its bell ringing and the whistle either blowing so as to be audible at the crossing or had been so blown as the law requires. The evidence also conclusively reveals that the near approach of the train at such a distance and under such circumstances created an immediate hazard at the crossing as the driver approached the same. With that approaching train plainly visible and sufficiently close that the

driver of the automobile drove into the side of the engine constituted a violation of the following provisions of Article 6701d, § 86, Subsections (c) and (d), which reads as follows:

"Whenever any person driving a vehicle approaches a railroad grade crossing, the driver of such vehicle shall stop within fifty (50) feet but not less than fifteen (15) feet from the nearest rail of such railroad and shall not proceed until he can do so safely when:

\* \* \* \* \* \*

"(c) A railroad engine approaching within approximately fifteen hundred (1500) feet of the highway crossing emits a signal audible from such distance and such engine by reason of its speed or nearness to such crossing is an immediate hazard;

"(d) An approaching train is plainly visible and is in hazardous proximity to such crossing."

Section 143 of the same Article makes such violation a misdemeanor offense punishable by a fine of not more than $200. It is admitted by all parties that the driver of the automobile did not stop within 50 feet of the railroad track and not less than 15 feet from it but proceeded until the collision occurred. His failure to so stop was in direct violation of the statute just previously cited. For this reason the driver of the automobile was guilty of negligence which proximately caused the collision and injuries as a matter of law.

It has been held as a matter of law under such circumstances that:

"\* \* \* appellants' failure to stop not less than 15 feet from the nearest rail of the track being used by the engine and his failure to wait until he could safely proceed was a proximate cause of the collision and its consequences." Lackey v. Gulf, C. & S. F. Ry. Co., Tex.Civ.App., 225 S.W.2d 630, 632.

In addition to other authorities previously cited our position in this matter is also supported by the cases of Texas & N. O. R. Co. v. Stewart, Tex.Civ.App., 248 S.W. 2d 177; Zamora v. Thompson, Tex.Civ. App., 250 S.W.2d 626; Panhandle & Santa Fe Ry. Co. v. Karr, Tex.Civ.App., 257 S.W. 2d 436, affirmed Tex., 262 S.W.2d 925. The Lackey case makes a further statement that is applicable to the facts here presented in the following language:

"We know as a matter of common knowledge that a railway engine is not easily hid or obscured, and that had appellant looked he must have seen the engine."

In the instant case the driver of the automobile or the other occupants could have seen the approaching train any time more than 100 feet from the crossing by a mere slight turn of vision to the left. It has been held that an injured party is not entitled to recover for injuries if his own negligence contributed to his injuries. McFall v. Fletcher, 138 Tex. 93, 157 S.W.2d 131.

We find no evidence in the record and certainly none of probative value to support a claim of damages on behalf of any of the appellants as against appellee on the grounds of negligence of appellee's agents or on any other alleged grounds. In our opinion the contrary has been conclusively established. Wichita Valley R. Co. v. Minor, Tex.Civ.App., 100 S.W.2d 1071; Cisco & N. E. R. Co. v. McCharen, Tex.Civ.App., 118 S.W.2d 844; Dixon v. Texas & P. R. Co., Tex.Civ.App., 164 S.W.2d 252; Texas & Pac. R. Co. v. Brown, 142 Tex. 385, 181 S.W.2d 68; 35 Texas Jur. 230–31; Louisiana, A. & T. Ry. Co. v. De Vance, Tex.Civ.App., 114 S.W. 2d 922; Edwards v. St. Louis Southwestern R. Co. of Texas, 105 Tex. 404, 151 S.W. 289.

For the reasons stated appellants' points of error are all overruled and the judgment of the trial court is affirmed.