**PANHANDLE & SANTA FE RAILWAY COMPANY, Appellant,**

v.

**N. R. LISCOMB et al., Appellees.**

**No. 5562.**

Court of Civil Appeals of Texas.

El Paso.

Jan. 30, 1963.

Rehearing Denied March 6, 1963.

Mays, Leonard, Moore & Dickson, Sweetwater, J. M. Preston, Pecos, for appellant.

Finley & Scogin, Kermit, Royal Hart, Richard W. Davis, Upton, Upton, Baker & Griffis, San Angelo, Walker F. Means, Robert S. Kent, Pecos, for appellees.

CLAYTON, Justice.

This is a "blocked crossing" case arising out of a collision between a truck-tractor pulling a tank semi-trailer being driven by William Lee Michum and a tank car in appellant's train, in which collision Michum, was killed. Michum was an employee of N. R. Liscomb, who filed suit against appellant for damage to the truck and trailer, wherein Liscomb's insurance carrier intervened. In a separate suit, Michum's surviving wife and two minor children filed suit against appellant for damages growing out of Michum's death, and in this suit Liscomb's Workmen's Compensation carrier intervened. These suits were consolidated for trial.

The collision occurred just past midnight and in the early morning of December 22, 1959 at appellant's spur track which crosses a farm to market road No. 652 at a slight angle near the town of Orla, in Reeves County, Texas. The farm to market road runs generally east and west, and the spur track approximately north and south. We consider the following facts pertinent to the decision we must reach in this case:

The deceased lived in the vicinity of Orla. His employer lived and had his place of business in Orla. The employer was engaged in road work and water hauling and in connection with the latter occupation used the truck-tractor and tank trailer involved in the collision. In the late evening of December 21, 1959 the deceased left his employer's place of business in the truck and trailer to deliver the last load of water for the evening. He proceeded east on Farm Road No. 652 and of necessity traversed the appellant's spur track crossing which was a little over a half a mile to the east from his employer's place of business. The deceased had been over this crossing many times, both in daytime and at night-time.

After delivering the load of water, deceased was returning to Orla, proceeding in a westerly direction from the east, along Road 652. At a distance of something over 430 feet east of the crossing there was an "early warning" sign advising of the railroad crossing, and just before the cross-

ing to the east there was a standard "reflectorized" crossing sign. For a little over nine-tenths of a mile to the east from the crossing, the road is perfectly straight and on a slight upgrade toward the crossing of about seven and ⅞ inches for each 100 feet horizontally. There were no buildings or other obstructions to the eye-sight on the east side of the crossing, the area being "good and clear". At the time of this accident there were no street lights in the town of Orla to confuse the vision, and the closest mountain was 26 miles away. Although the night was described as "dark", there were no adverse weather conditions. One of the witnesses described the night as a "cold still night" and stated "you could see quite a ways." The highway was of black asphalt. As deceased approached this crossing, appellant's employees were slowly (four miles or less per hour) backing a switch-engine with a string of eleven railroad cars across the road toward a loading rack which ran along the west side of the track. A conductor for the appellant was at the crossing to see that it was clear as the string of cars backed in a northerly direction across the road, after which he went to the loading rack to make a coupling between the cars in the train and some cars already at the loading rack. As the train slowly backed toward the loading rack the deceased ran his truck into the fourth car from the north end of the string of railroad cars, this car being a tank car which was completely across the highway at the time. There were seven cars and the engine south of the car that was struck. The engine had headlights on each end that contained two sealed beams, each burning. It had two "classification" lights on the front end; four lights for the engine numbers, one on each corner of the engine; the gauge lights in the cab, and two ground lights under the cab deck—all burning. As the train started backing over the highway the regular crossing whistle signal was given and the engine bell was set to ringing constantly. While the train was on the crossing, the lights of the oncoming truck could be seen, possibly "when it first came around the curve", a little more than nine-tenths of a mile to the east.

Both the tank-trailer and the tank car involved in this collision were empty at the time. The tractor with its equipment weighed in the neighborhood of 11,000 pounds, and the tank-trailer it pulled weighed from 6,500 to 7,200 pounds, or a combined weight of 17,500 to 18,200 pounds. The tank car weighed 66,200 pounds. The tank car was black with the word "BEACON" painted on the sides in white letters. The letters in this word were horizontally two feet across and vertically three feet high, extending a distance along the body of the car of 23 feet. Th bottom of these letters was six feet 7 and $^{13}\!/_{16}$ of an inch from the top of the rails. There were other, smaller, letters and numbers painted on the sides of the car. The eye-level of a person of normal height, as he sat on the seat of the truck-tractor, would be about five feet 6 or 7 inches above the ground. Investigation showed that a "Beacon" tank car could be seen at night in the light of standard vehicle headlights at distances of from 600 to 750 feet.

The motor of the truck-tractor had a "governor" on it set at 58 miles an hour. The lights and the brakes on the tractor were in good condition, but the brakes on the tank-trailer "weren't too good". A witness with a Bachelor of Science degree, who had made a study of kinetics, was called by the appellees and he estimated the speed of the tractor and tank-trailer at the time of the collision as approximately 39 miles per hour. A witness called by the appellant who held Bachelor of Science, Master of Science and Doctor of Philosophy degrees scientifically estimated the speed of the truck and tank-trailer at 61 miles per hour, or "right in the 60 mile an hour range". The appellant called a Texas highway patrolman who investigated the accident, and he estimated such speed as between 55 and 60 miles an hour. The appellant called a deputy sheriff, formerly a Texas highway patrolman, who also .in-

vestigated the accident, and he estimated such speed as about 60 miles an hour. The cab of the truck-tractor was crushed in the collision and burned. After the deceased was removed from the cab his right shoe sole was still on the accelerator and his left shoe sole was on the floor-board of the cab between the seat and the clutch. There were no skid marks on the pavement.

It has been stated that the tank car which was struck by the truck had an empty weight of 66,200 pounds. It rested on "couplings" or "couplers" at each end of the tank over the "trucks" of the car which include the wheels at each end of the car. The tank is held on the trucks by center castings, twelve inches in diameter and about two inches deep, through which center pins of iron or steel are run on down through the couplings, which are eleven inches deep. The force of the impact by the truck-tractor and semi-trailer raised the tank completely off the trucks of the tank car—a height of 18 to 21 inches—and it came to rest on the highway west of the tracks a distance of approximately fifteen feet at the north end of the tank and four feet at the south end. The center pins were bent. One of the tank car trucks, weighing 7,240 pounds, was pushed off the tracks. The connecting pin on the tank semi-trailer was sheared off and the trailer went up and over the cab of the truck, crushing it and probably striking the tank car itself. The truck-tractor was demolished.

It was stipulated at the trial that there were no stationary mechanical devices of warning of appellant's at the time and place of the collision.

Testimony was introduced by appellees for the purpose of showing that this crossing was more than ordinarily dangerous as a night-time crossing. There was one collision of an automobile with a box car at this crossing in 1955 at 11:30 one night. Investigation revealed that the automobile was travelling west at 70 miles per hour. No claim or lawsuit followed this collision.

There was a "near miss" between a tractor, pulling a semi-trailer, and a tank car on this crossing in June of 1959. This occurred at night between twelve and one o'clock, and the highway was "a little bit slick" after a little rain, but visibility was good. The vehicle was travelling west at a rate of 40 to 50 miles an hour, the driver saw the tank car from 115 or 120 feet away and stopped on slick pavement in time to avoid a collision. The driver of the vehicle had gone over this crossing probably a thousand times from March till September of 1959, and the related occurrence was the only time he had seen a train stopped on the crossing.

Another witness testified to a "near miss" at night-time on April 30, 1958 while he was driving a truck and tank-trailer containing 112 barrels of water in a westerly direction at about 30 to 35 miles per hour. The driver saw the engine of a train approaching the crossing about 60 feet away, applied his brakes and turned off the highway into solid sand and his vehicle hit a post. The truck stopped so close to the engine "that you couldn't have got between it and the engine". The driver testified that going from east to west on the highway at night, he had to turn off his lights to see if there was a beam from the headlight of an engine to disclose the presence of a train approaching the crossing. He stated that he had hauled close to 1,000,000 barrels of water over this crossing, but this was the only "near miss" to which he testified.

Another witness had been over this crossing hundreds of times and on two occasions, driving a pickup truck going west after midnight, he had had to put on his brakes and turn off the highway to avoid striking railroad cars loaded with black pipe on the crossing. He had experienced no difficulty going toward the east, but he stated that going west there was "just a big blank black spot" at the crossing.

Another witness testified to having "near misses" while driving both east and west on the highway late at night—that the crossing was just "a blind spot". This witness had worked in and around the town of Orla since 1949. He testified to either three or four occasions when he had difficulty seeing cars on the crossing.

Of significance to us is the fact that in all but one of these prior instances at this crossing, under conditions sometimes less favorable to a cautious driver than those existing in the instant case, the vehicles on the highway were stopped by the drivers before a collision with a railroad car could occur.

Special Issue No. One as submitted to the jury was as follows:

"Do you find from a preponderance of the evidence that, at the time and on the occasion in question, the conditions surrounding the crossing in question were such as to render that crossing more than ordinarily dangerous as a nighttime crossing?

"Anwer 'Yes' or 'No'.

"In connection with the foregoing Special Issue, you are instructed that by the term 'more than ordinarily dangerous' is meant that the crossing would not be more than ordinarily dangerous unless its condition was such that a reasonably prudent person could not, by the exercise of ordinary care, use same with safety."

The jury answered this issue in the affirmative.

By its first, fourth and fifth points of error, appellant urges that there is no evidence to support the jury's finding that the crossing in question was more than ordinarily dangerous as a night-time crossing, or that such finding was based on insufficient evidence, and that such finding was so contrary to the great weight and preponderance of the evidence as to be clearly wrong. Appellant in its brief sets out that the legal standard of an extra-hazardous crossing, or one that is more than ordinarily dangerous as a night-time crossing, is a crossing which is so peculiarly dangerous that a person of ordinary care and prudence cannot cross in safety unless the railroad used extraordinary means to warn the motorist of the presence of the train. We are cited to the two companion cases of Texas & N. O. R. Co. v. Stratton decided by the San Antonio Court of Civil Appeals in 1934, both writ refused, and appearing in 74 S.W.2d 741 (Civ.App. No. 9383) and 74 S.W.2d 746 (Civ.App. No. 9377). The cause of action in these cases arose from a night-time collision between a passenger car and a railroad train of appellant in which collision the four young people riding in the car were killed. We are impressed by the similarity, in most essentials, of the facts in the Stratton cases and the case before us. The following is quoted from the nature of the case appearing in Civ.App. No. 9377:

"The accident occurred at the intersection of a paved state highway and one of appellant's spur tracks, two miles out of Eagle Pass, when the motorcar ran head-on into the middle of a 380-foot train which was moving slowly across the highway at a probable rate of 3 or 4 miles per hour.

"The train was executing a switching movement. An engine with six cars was detached from a made-up train on the main tracks, a few hundred feet away, and was backed out on the spur track, past the crossing, to pick up two cars stationed a short distance beyond the crossing. The coupling was made, the air connected, and the engine was pulling the eight cars back towards the main track. The engine, moving forward, had pulled the string of cars half way across the highway, when the motorcar, moving over the highway at a rate of speed variously estimated at from 17 to 65 miles per hour, collided with the fourth car of the moving train."

The following is added by the opinion in Civ.App. cause No. 9383:

"＊  ＊  ＊  The evidence clearly shows that the highway was straight and almost level for a distance of eight or nine hundred feet in the direction from which the Ford automobile was approaching the crossing. There were no obstructions, except houses and mesquite trees set well back from the highway. The train was lawfully upon the highway, and was moving slowly in an easterly direction. The engine with its bright headlight had crossed the highway and had proceeded about 190 feet when the Ford automobile, in which Joseph R. Stratton and Carrie D. Stratton were riding, ran into the train and collided with the fourth car from the engine."

The evidence was conflicting as to whether the night of the accident was clear or foggy.

The court in the last quoted case held:

"＊  ＊  ＊  It occurs to this court that whether the visibility was good or bad the trainmen had a right to presume that people using the highway would drive at a rate of speed which would permit them to bring their automobile to a full stop if within the reach of their lights it should be discovered that the highway was blocked by a slow moving train.  ＊  ＊  ＊"

"The evidence is insufficient to show that this crossing, even under the existing bad visibility, was an extrahazardous crossing, but even if it be regarded as such the evidence clearly shows that flagmen, lanterns, or other signals could not and would not have avoided this accident. If a moving box car or a burning automobile could not be seen, then certainly a flagman with a lighted hand lantern could not have been seen. Whether you accept the evidence that the visibility was good, or that it was bad, you reach the conclusion that ap-pellant could not be liable. The use of signs, signals, and warnings is for the purpose of letting persons using the highway know of the presence of the crossing, and that a train is approaching the highway. Under the facts in this case, after the train had completely blocked the highway and was lawfully passing over the highway, it was within itself sufficient warning to persons using the highway to beware of the train."

The following is added in the opinion in Civ.App. Cause No. 9377:

"The duty of the railroad company's train operatives in this situation was to exercise due care in aproaching and crossing the highway to avoid colliding with persons passing thereon. On the other hand, persons using the highway were under the reciprocal duty of using due care in approaching and crossing the railroad tracks to avoid colliding with trains passing thereon. It is perfectly obvious that those in the automobile failed to use such care, and this failure, whether negligent or not does not matter, was the proximate cause of the accident, as a matter of law."

Appellant also refers us to the case of Texas & N. O. R. Co. v. Compton, 135 Tex. 7, 136 S.W.2d 1113, decided by the Supreme Court in 1940, which specifically approved the opinions in the Stratton cases.

It is considered appropriate to quote excerpts from the Compton case:

"The material facts are few. About one o'clock at night Grover Carrington left Texas City in his automobile for Galveston. Charles Compton and others accompanied him on the trip. The night was dark and foggy and the visibility was poor. A few miles from Texas City the automobile ran into a slowly moving freight train and Compton's death resulted from the collision. The highway ran over a flat prairie

country, and in the vicinity of the intersection there were no trees, houses or other obstructions to the view. The highway and railroad track crossed at right angles. The train consisted of 87 cars, and the automobile struck the sixtieth car from the engine. The train was moving eight or ten miles per hour and the automobile much faster.

\*    \*    \*    \*    \*    \*

"\* \* \* Another ground relied upon was the failure of the railroad company to use extraordinary means to give warning, such as to equip its freight cars with lights and have same burning at night, to equip its crossing with signal bells or lights or to have a watchman stationed thereat. Negligence cannot be based upon such omissions, for the crossing was not extra-hazardous and therefore no duty was cast upon the railroad company to observe these extraordinary precautions. It would be difficult to conceive of a railroad crossing at which the hazards would be more obvious than at this one."

The Supreme Court then cites similar conclusions reached in this and other jurisdictions. Appellant calls our attention to other Texas cases that have cited and followed the decisions in the Stratton cases, including Kypfer v. Texas & P. Ry. Co., 88 S.W.2d 528 (Tex.Civ.App.1935, writ dismissed); Texas & N. O. R. Co. v. Beard, 91 S.W.2d 1080 (Tex.Civ.App.1936, writ refused); Texas City Terminal Ry. Co. v. Allen, 181 S.W.2d 727 (Tex.Civ.App.1944, writ refused); Lundberg v. Missouri-Kansas-Texas R. Co. of Texas, 232 S.W.2d 879 (Tex.Civ.App.1950, writ refused, N.R.E.); Gulf, C. & S. F. R. Co. v. Pratt, 262 S.W.2d 775 (Tex.Civ.App.1953, writ refused, N. R.E.); Woods v. Panhandle & Santa Fe Railway Company, 315 S.W.2d 953 (Tex. Civ.App.1958, writ refused, N.R.E.); and Missouri-Kansas-Texas Railroad Company of Texas v. Beasley, 321 S.W.2d 938 (Tex. Civ.App.1959, writ refused, N.R.E.). Also

cited is the 1953 decision of the Supreme Court in Karr v. Panhandle & Santa Fe Ry. Co., 153 Tex. 25, 262 S.W.2d 925.

Applying to the facts of the instant case the law as promulgated by the decisions above quoted from or referred to, we arrive at the following conclusions:

■ There is insufficient evidence to support the jury's finding that at the time and on the occasion of the collision the conditions surrounding the crossing were such as to render the crossing more than ordinarily dangerous as a night-time crossing, and such jury's finding is contrary to the great weight and preponderance of the evidence, and was wrong. Appellant's first point of error is overruled, but its fourth and fifth points are sustained.

In answer to Special Issues Nos. Two, Three, Four, Five, Six, Seven and Eight the jury found that appellant, through its agents, servants or employees, knew or by the exercise of ordinary care, should have known, the conditions surrounding the crossing; that it failed to maintain adequate physical mechanical warning devices on the east side of the crossing; that this was negligence and a proximate cause of the collision, as was also its failure to maintain a flagman with signaling device on the east side of the crossing. In its second point of error the appellant maintains that there is no evidence to support the jury's findings of negligence on the part of appellant in not having a mechanical warning device or flagman at the crossing and that such negligence was a proximate cause of the collision.

■■ There being insufficient evidence to show the crossing to be extra hazardous as a night-time crossing, negligence of the appellant cannot be predicated upon the failure of the appellant to use extraordinary means to give warning to motorists using the crossing, such as mechanical warning devices or a flagman at the crossing, since "no duty was cast upon the railroad com-

pany to observe these extraordinary precautions". Texas & N. O. R. Co. v. Compton, supra. Appellant's second point of error is sustained.

■ Appellant's third point of error is directed at the failure of the court to hold that the deceased was negligent, which was a proximate cause of the collision in driving the truck into the train after it had completely covered the crossing. The evidence showed that the engine of the train was equipped with normal lights, all burning; that the usual crossing whistle signal was given; that the engine's bell was ringing constantly; that the appellant's conductor was at the crossing to see that it was clear as the train backed across the highway; that an "early warning" sign and a standard "reflectorized" sign advised of the crossing, and that deceased was familiar with the crossing, having been over it many times, both in daytime and at night-time. The train was lawfully upon the crossing, appellant's employees having exercised due caution in approaching and crossing the highway to avoid colliding with persons passing thereon. On the other hand, it is obvious from the fact of the collision itself and its attendant circumstances, as well as the evident force by which the truck-tractor struck and toppled over the tank and moved the trucks of the railroad tank car, that the deceased failed to use such care as would have been required of him to avoid colliding with the train as it lawfully occupied the crossing. (Stratton cases, supra). The appellant's third point of error is sustained.

There are other points of error. Each of them has been carefully examined, as well as all of appellee's counter-points, but we find nothing to alter our conclusion that this case must be reversed. Since all matters have been fully developed in the more than 460 pages of testimony and sixty exhibits, no useful purpose would be served in remanding this cause, and it is therefore hereby rendered in favor of the appellant.

Reversed and rendered.