MISSOURI-KANSAS-TEXAS RAILROAD COMPANY OF TEXAS V. MRS. MARY LOLA MCKINNEY ET AL.

No. 7595. Decided January 1, 1941.
Rehearing overruled February 5, 1941.
(145 S. W., 2d Series, 1081.)

*Chas. C. Huff,* of Dallas, *Naman, Howell & Boswell,* of Waco, and *Dan Moody,* of Austin, for plaintiff in error.

It was error for the Court of Civil Appeals to hold that the operators of the railroad train were guilty of negligence in attempting to cross the highway when they saw the truck coming at the speed it was, and they knew it could not stop on account of the wet pavement, and knew that they could stop the train in a few feet but failed to do so. Texas & N. O. Ry. Co. v. Stratton, 74 S. W. (2d) 741; Post v. State, 171 S. W. 707.

*Conway & Scharff,* of Waco, for defendant in error.

On the proposition of negligence: Eastern Texas Elec. Co. v. Joiner, 27 S. W. (2d) 917, 44 S. W. (2d) 983; Southland Greyhound Lines v. Cotton, 126 Texas 596, 91 S. W. (2d) 326; Reilly v. Buster, 52 S. W. (2d) 521.

MR. JUDGE TAYLOR delivered the opinion of the Commission of Appeals, Section B.

This suit arose out of a collision on State highway No. 2 (Dallas-Waco highway) between a train and a truck. The scene of the accident was about five miles north of Waco where the Texas-Central branch of the Missouri, Kansas & Texas Railroad Company of Texas crosses the highway. The highway runs north and south. It is a hundred feet in width, the central paved portion being twenty feet wide and the unpaved portion on the sides being each forty feet wide. On the occasion of the accident J. N. McKinney, a car inspector for the railroad company, was riding on the south side of the tank car. The train, which consisted of an engine and tank car, was proceeding across the highway from the east, moving directly westward. The truck was approaching the crossing from the north on the paved portion of the highway. The collision occurred when the train was partially across the highway. The engine had cleared the eastern unpaved and the central paved portion, but the tank car had not cleared the paved portion when the truck collided with it. The truck struck the car on its north side about ten feet back from the west end, overturning the tank and its attachments onto McKinney in such manner as to crush him beneath the wreckage.

Mrs. Lola McKinney, the surviving widow, brought this suit for herself and two minor children against Jackson-Strickland Transportation Company, Inc., owner and operator of the truck, and against the railroad company, to recover damages on account of McKinney's death. Upon a jury verdict the trial court entered a joint and several prorated judgment for plaintiffs, and denied the railroad company's motion for judgment non obstante veredicto. Each defendant was granted judgment over against the other for contribution. Both defendants appealed, the railroad company seeking primarily to have the trial court's judgment reversed and rendered in its favor, and in the alternative to have the judgment reversed and remanded; the transportation company seeking primarily to have the judgment reversed and remanded, and in the alter-

native to have the relief sought by the railroad company by way of a rendition in its favor, denied, and to have the transportation company's judgment for contribution against the railroad company affirmed.

The Court of Civil Appeals affirmed without modification the trial court's judgment. 126 S. W. (2d) 789. The transportation company did not seek a review by writ of error to this Court. The writ was granted upon the railroad company's application.

The record is too voluminious to state more than is essential to an understanding of the basic question presented. None of the pleadings will be stated since no contention is made here as to their sufficiency for present purposes. It was agreed between plaintiffs and the railroad company that at the time of McKinney's death both the company and the train on which he was working and the employes thereon were engaged in intrastate commerce. Two hundred thirty-four special issues were submitted in the charge and sixty-seven others appear in the transcript as having been specially requested by defendants and denied submission by the trial court. The refusal to submit the latter and the findings made in response to the former will be referred to only insofar as they relate to the questions involved.

Sufficient facts have been stated to give a bird's eye view of the accident, its setting and the manner of its occurrence. A more comprehensive picture will be presented by a recital of further undisputed facts in order to make more apparent the decisive questions presented.

The Texas Electric transfer tracks are located a short distance west of the highway at the point of the crossing. The purpose of the train movement at the time of the accident was to deliver the empty tank car on which McKinney was riding to the Texas Electric and to there pick up some other cars. It was about 6:40 on a July morning. It had rained some during the early morning hours and the highway was wet. The train, a switching train moving westward from the Bell Mead yards in east Waco toward the transfer tracks on the other side, came to a stop when the front end of the engine reached the eastern edge of the unpaved portion of the highway. The highway is straight from its intersection with the railroad to the crest of a hill to the north about a mile distant. The road is level for about three-fourths of this distance and slopes gradually upward for the remaining one-fourth. Operators of vehicles upon the highway, when visibility is normal, can see a train at the crossing all the way from the crest of the hill to

the crossing, and persons at the crossing can see a truck all the way to the crest of the hill, as well as from the point where the engine stopped at the east edge of the highway. As the train started up from its stopped position to move across the highway the engineer was in the cab on the right side of the engine (the side from which the truck approached) and three railroad employes were stationed on the footboard on the front end of the engine and one on the rear of the engine. Mr. Moody, the engine foreman in charge of the train was on the right end of the footboard (on the side from which the truck approached), a switchman was standing in the center of the footboard to his left and to the left of the switchman another switchman was standing on the south end of the footboard. The employe on the rear of the engine was a switchman also and was on the left or south side. When the train started up upon the order of Mr. Moody from its stopped position the truck appears to have been at least 800 feet north of the crossing. The truck which was approaching carried a trailer without braking power other than that afforded by the truck brakes, the trailer brakes not being "hooked up." The freight bill discloses that the load on the trailer was 10,213 pounds.

At this point the details concerning the accident will be stated from the viewpoint of W. S. Burge, the driver of the truck, a witness for the transportation company. He was coming down the highway. "I was around 120 feet from the crossing" he said, when he saw the engine entering the highway. He "jammed on" his brakes and "slid into the tank car." It was his first trip over the highway. The trailer was carrying a load of steel army lockers. It was not raining at the time of the accident but was cloudy and somewhat misty and foggy. He testified he could not see more than 200 feet as he came up to the crossing and was driving "around 20 or 25 miles an hour." Detailing further the position of the train with respect to the paved portion of the highway, when he first saw the train, the witness said: "The front end of the engine was just entering the concrete slab * * *. I would judge it was going between 20 and 25 miles an hour." He states that he "jammed on" his brakes (mechanical brakes) but that a loaded truck could not be stopped as quickly on a wet highway as on a dry one; and further that when he applied his brakes the wheels both on the front and rear of the truck slid; that he pulled to the west and at the time of the impact the front end of his truck was facing the west; that when he turned his truck to the left "it slid to the left, jack-knifed, letting the front end of

the trailer slide right into the front end of the car." The trailer struck "the tank car head on."

On cross examination the witness stated that at the time of the impact he had reduced his speed from the rate at which he was going when he saw the train to 12 or 15 miles an hour; that when he "slapped on" his brakes the truck and trailer slid a distance of about a hundred feet; that the force of the impact tore the "truck tractor practically all to pieces" and the "trailer all to pieces"; that "it scattered that 10,000 pounds of steel all over the road."

The jury found the transportation company negligent with respect to the following matters: In operating the truck at an excessive rate of speed; in operating it at a speed in excess of 40 miles an hour; in the failure of the driver of the truck to keep a proper lookout; in his failure to listen for approaching trains as he neared the crossing, and in failing to observe it in time to avoid the collision; in failing to heed the warning signals on the highway warning traffic of the location of the crossing; in failing to heed the warnings of the train's approach to the crossing sounded by the operators of the train; in operating the truck and tailer with a load of more than 7,000 pounds; in operating them with a load of excessive weight; for the failure of the driver to have the truck and trailer under proper control as he approached the crossing; and for his failure to yield the use of the crossing to the train.

The jury found also that each of the foregoing acts of negligence on the part of the transportation company was a proximate cause of the collision.

The jury found other acts of negligence on the part of the transportation company but they need not be recited as it further found none of such other acts proximately caused the collision.

It is not necessary to point out the testimony bearing on the transportation company's acts of negligence found to have proximately caused the collision as it is apparent from what has been stated already that they are supported by a mass of testimony, much of that against it being undisputed.

The railroad company was found not negligent in most of the particulars alleged. The jury did find, however, that the employes in charge of the train were negligent in the following particulars: In starting the train from its stopped position before the truck passed over the crossing; for failure to stop

the train as it approached the east edge of the paved portion of the highway; and for the failure of the engineer to blow the whistle as the train approached that point.

Each of the foregoing acts of negligence was found to be a proximate cause of the collision.

Other findings against the railroad company are that the conditions surrounding the crossing were such as to render it "more than ordinarily dangerous as a daytime crossing," and that such conditions were known to the railroad company. These two findings, together with the findings that the employes in charge of the train negligently failed to place a flagman north of the intersection to warn the oncoming traffic of the approach of the train and that such negligence proximately caused the collision, will be later referred to.

The railroad company contends on the one hand there is no evidence it was guilty of any negligent act which resulted in the collision, and on the other that the negligence of the truck driver in not yielding the crossing to the train was the sole proximate cause as a matter of law.

The jury found the truck driver's negligence in not yielding the crossing was one of many proximate causes of the accident, with which we readily agree; but we cannot agree that it was the sole proximate cause. In view of this conclusion it will be unnecessary to point out the evidence supporting more than one of the negligent acts of the railroad company found by the jury to have resulted in the accident, namely, that of the train operatives in failing to flag the train movement over the crossing as a warning to oncoming traffic.

The railroad company enacted the following rule relating to the movements of switching trains over this crossing;

"Road and yard movements over the new Dallas highway crossing between Caphead and Bem must be flagged from both sides of train of cars if handled by yard engines. If blocked by either train or yard movement the crossing must be cut."

Mr. Moody himself interpreted the order in his testimony. In response to an inquiry as to what the flag order was, propounded before a copy had been introduced, he said: "Stop and flag crossing; man flag the crossing before we go across." He further stated that he knew "there was a flag order on that crossing"; that the order had been in force about a year, and he knew "that under that order a flagman was supposed *to be put out* to flag that crossing before a train went over it." (Italics ours) ; and that a bulletin had been issued by the company sometime prior to the accident requiring the crossing to

be flagged. Engineer Keith testified he was cognizant of these facts; that the crossing was dangerous and that "a flagman was not put out to flag the crossing" on that morning.

This crossing was a dangerous one. Whether it was extra hazardous need not be determined. The dangers incident to the switching movement at the time of the accident will be discussed only insofar as they bear on the question of whether failure of the operatives of the train to flag the crossing was negligence that might reasonably result in a collision between the train and the truck.

Mr. Moody, the engine foreman who had been making one trip a week for two years over the crossing in charge of a switching crew, was familiar with it, and with traffic conditions at that point. It was his duty among others to give the train the go ahead signal before moving up from a stopped position, as he did on the morning of the accident. He testified as a witness for the railroad company that "there was lots of travel over that highway"; that it "consisted of automobiles, trucks and buses; that while he had on occasion, gone over the crossing in the early part of the morning without seeing automobiles coming from both directions, it was seldom one could "look up beyond that crossing" without "seeing an automobile somewhere"; and that "very few cars make less than sixty miles along there * * *." The engineer's testimony was to about the same effect.

Both Moody and Keith saw the truck near the crest of the hill about three-fourths of a mile away approaching the crossing, while the train was in its stopped position on the eastern edge of the highway. Moody said the truck was traveling sixty miles an hour when he first saw it and that it slackened its speed very little. Notwithstanding this situation Moody gave the "go ahead" signal without putting out a flagman and Keith obeyed, and succeeded in getting only the engine over the paved portion of the road before the truck hit the tank car.

■ The action of the engine foreman and the engineer in thus violating the flag rule was negligence. Texas Trunk Ry. Co. v. Johnson, 75 Texas 158, 12 S. W. 482; Cleveland Nehi Bottling Co. v. Schenk, 56 Fed. (2d) 941. They could reasonably have anticipated from the facts just stated that failure to observe the rule might result in a collision between the truck and the switch train. Carey v. Pure Distributing Corp. et al, 133 Texas 31, 124 S. W. (2d) 847; Missouri K. & T. Ry Co. v. McLain, 133 Texas 484, 126 S. W. 474; Sullivan et al v. Flores, 134 Texas 55, 132 S. W. (2d) 110; Foster v. Woodward et ux (wr. ref.), 134

S. W. (2d) 417; Sturtevant v. Pagel, 134 Texas 46, 130 S. W. (2d) 1017; Miller v. Union Pac. R. Co., 290 U. S. 227, 78 L. ed. 285.

The railroad company cites in opposition to the conclusion that it could be reasonably anticipated that an accident would occur, Texas & N. O. Ry. Co. v. Stratton (wr. ref.), 74 S. W. (2d) 741 and Texas & N. O. Ry. Co. v. Compton (135 Texas, p. 7), 136 S. W. (2d) 1113, both of which are readily distinguishable from the present case.

In the Compton case the employes operating the train did not see and could not have seen, before entering upon the crossing, the automobile which collided with the train, which was 87 cars in length. It is pointed out in the opinion that the engine at the time the automobile struck the sixtieth car back was more than half a mile from the intersection, the engine having cleared the crossing three minutes before. Nor could the occupants of the automobile, who were more than one and a half miles distant when the engine entered the crossing, have seen the warning sign in question at the crossing on that dark night. In the Stratton case the Court of Civil Appeals held that the *evidence was insufficient* to show the crossing was more than ordinarily hazardous as a nighttime crossing. It is pointed out in the opinion in this connection that the crossing was on a spur track used on an average only once in twenty-four hours. There is no evidence that the train operatives saw or were negligent in not seeing, the automobile before the train approached and went upon the crossing. The opinion in that case deals with a situation existing while the train was "lawfully passing over the highway" and while it was lawfully obstructing the passage of traffic over the intersection. The train was not, as in the present case, proceeding across the intersection in violation of the company's rule, negligently, or, as in the McLain case, negligently blocking the crossing in violation of law. In neither the Compton nor the Stratton case is there any evidence that the train operatives moved the train upon and across the intersection negligently. The holding of the Court of Civil Appeals with respect to the crossing, thus fixing its status as applied to the circumstances of that case as not more than ordinarily dangerous, was binding upon this Court; and in view of such status it followed as a matter of law, as held by the Court of Civil Appeals, that the railroad company was not negligent in not maintaining a light, or other extra precautionary signal, "at the intersection of a highway and a spur track used only occasionally."

Whether the crossing in the present case was more than ordinarily hazardous need not be determined, or considered. It has been pointed out that the operatives of the engine and tank car were negligent in their switching movement at the crossing in violation of the flag rule, and that they could reasonably have anticipated that a collision would occur.

Nor do the findings of the jury with respect to discovered peril of the truck driver, eliminate from the case the issues of primary negligence on the part of the railroad company which resulted in McKinney's death. Smith v. Galveston-Houston Elec. Ry. Co. (Com. App.), 277 S. W. 103; Hines v. Foreman (Com. App.), 243 S. W. 479; Dallas Ry. & Ter. Co. v. Bankston (Com. App.), 51 S. W. (2d) 304; Panhandle & S. F. Ry. Co. v. Sutton (Com. App.), 81 S. W. (2d) 1005. The jury found that the train operatives did not discover the perilous position of the deceased. Furthermore, he had no part in operating the train and no question of negligence on his part is involved. The finding of discovered peril affected only the negligence of the operatives of the train that arose after they took deceased into what they recognized as the realm of danger, and not that negligence which had to do with taking him into that realm. In moving up from their stopped position on the edge of the highway Moody and Keith assumed (mistakenly) the truck driver would slacken his speed. They took the risk, slight though it may have appeared to them to be, and proceeded across the highway in violation of the company's rule promulgated in the interest of safety for such movements. It is not within our province to say there was no evidence under facts stated that a collision would probably result. Pure Distributing Corp. v. Carey, and other cases cited with it, supra.

Under the facts stated both defendants were guilty of negligence proximately causing the accident, and the negligence of the truck driver in not yielding the crossing to the train was not the sole proximate cause. The findings that both defendants were negligent renders unnecessary any discussion of the question of unavoidable accident.

■ The last assignment of error necessary to be discussed complains of the following statement made by Mr. Conway, counsel for plaintiffs:

(1) "Life is cheap to these corporations; it didn't mean very much to them to take the life of this woman's husband.

(2) "This railroad corporation used the life of Mr. McKin-

ney for nineteen years and when they wiped that life out they left her cold with two orphan children."

The record necessary to be considered in passing upon this assignment is made up of arguments by Messrs. Conway and Scharff, representing plaintiffs, and of Messrs. Scurlock and Darden, representing the transportation company and of Messrs. Boswell and Naman, representing the railroad company, together with a portion of the evidence to which the argument relate.

The application for the writ quotes a part of the argument by Mr. Conway to show the setting in which the first statement (italicised statement below) appears. It reads:

"He took care of his home during the afternoon; he did repair work around the house, worked that yard, did the garden work, and Mrs. McKinney says he helped her to wash those dishes and do whatever there was to be done about the house. In other words, Jim McKinney was a good husband to Mrs. McKinney. Now Jim McKinney is not there; now he cannot help Mrs. McKinney about the house any more; he cannot put the money there in the bank—she has got to do that herself. Jim McKinney is gone and he has left Mrs. McKinney alone to face those responsibilities, and one of these truck corporation lawyers comes along and says that, Mrs. McKinney, you have not lost but $7800.00 when your husband was killed. *Life is cheap to these corporations; it didn't mean very much to them to take the life of this woman's husband and one of them even says that all together $7800.00 would be * * *"* (sufficient compensation).

Counsel for both defendants objected to the first statement on the ground that it was inflamatory and prejudicial.

The objection was overruled. The trial court in qualifying the bill of exception set out about a page of argument by Mr. Scurlock made prior to Mr. Conway's, in which he contended that in view of the salary McKinney was making at the time of his death, $300.00 would be all that the older boy could have expected by way of contribution from his father, that $1500.00 would be all the younger son could have expected to receive and that about $6,000.00 was all Mrs. McKinney could have expected, making a total compensation in damages of $7800.00; also that Mr. Scharff, for plaintiffs, had argued for a total recovery of $37,500.00 and that Mr. Darden, in his argument made prior to Mr. Conway's, had sought to refute the $37,500.00 contention. It is pointed out in the qualification also that there was evidence that McKinney, who had worked for the com-

pany many years, had a life expectance of twenty-one years and earned $2,135.00 the year preceeding his death; that his hours of work were from eleven o'clock p. m. to seven a. m.; that he slept during the forenoon and worked around home and assisted his wife in the afternoons; and that he deposited his salary to the joint account of his wife and himself.

Obviously the court's action in overruling the objection to the first statement was correct, as it was in direct reply within the evidence to the prior arguments pointed out.

The application for the writ quotes another part of Mr. Conway's argument to show the setting in which the second statement (italicised statement below) appears. It reads:

"We say to this truck corporation and to this railroad corporation, you took from this woman her husband who walked by her side for twenty-five years and left her with the responsibility and care to take care of her own home and it worth to her $30,000.00, and I ask that you write that in there and don't count the loss to her so cheap.

"This railroad corporation opens the windows of heaven again and asks the sealed lips of Jim McKinney to come in and talk about his oldest son. They have the nerve to come here and tell you Jim McKinney says the boy has been giving him trouble. Yet they say they want to be fair to you. They come in here and humiliate those young men and tell you all they are trying to do it, do what is right. *This railroad corporation used the life of Mr. McKinney for nineteen years and when they wiped that life out they left her cold with two orphan children* * * *."

The court's first qualification of the exception complaining of the above argument strikes out a portion of the proposed bill, and the last qualification points out that there was evidence that McKinney and his wife had been married for 25 years at the time of his death and that he left surviving him his widow and two sons, the elder nineteen years of age and the younger, sixteen; that at the time of McKinney's death he had been continuously employed by the railroad company for 19 years.

The second qualification is as follows:

"That immediately following the argument by Tom Conway, one of the counsel for plaintiff, the following proceedings *and none other* were had with reference to said argument.

"Mr. Naman: We object to that argument—

"The Court: I sustain the objection to that.

"Mr. Naman: We ask that the jury be instructed not to consider that argument.

"The Court: Gentlemen, you will not consider that part of it." (Italics ours).

The third qualification points out that Mr. Naman, counsel for the railroad company, in cross examining McKinney's immediate foreman who had testified that McKinney wanted to give his boys an education, sought to elicit from the witness that the older boy did not care for an education; that the witness stated it "seemed from his school record" that "he did not go very much"; that Mr. Conway then elicited from the witness that about the only thing he had ever heard McKinney say in this connection was that the boy "always wanted the car and when he would let him have it he would stay out too late at night, and that he was having trouble with him in that way."

The fourth qualification points out that Mrs. McKinney, under cross examination by Mr. Naman, testified in response to an inquiry whether the older boy attended high school very regularly, that he did the first year but was out on account of his eyes a good deal; that she did not remember just when he dropped out but thought he dropped out sometime about March 1935, and did not remember why; that in September, before McKinney was killed in July 1936, he had entered school but had dropped out about two month later. The qualification disclosed that the closing part of the cross examination was as follows:

"Q. And during all of that time, Mrs. McKinney, that he was * * * in and out of school for a few months at a time, he never passed a subject, except cooking, isn't that true?

"A. I don't know.

"Q. You did not keep up very well then with the boy's education, did you?

"Well . . .

"Q. I believe that's all."

The boy's school record was not offered in evidence.

The court's fifth qualification of the bill points out that prior to Mr. Conway's argument Mr. Boswell, one of the attorneys for the railroad company, made the following statement:

"I believe, *from the testimony in this case* * * * that *if Jim McKinney could come into this court room this morning,* that he himself would not point his finger at any railroad employe and say 'you are responsible for my death.' I believe that is

true. I don't believe Jim could contend, if he could talk this morning, he could not point his finger at Mr. Williams and say, 'you have done something you should not have done,' or 'you failed to do something that you should have done,' or to those other men who were his life-long friends." (Italics ours).

It appears also in this qualification that Mr. Darden, one of the attorneys for the transportation company, made the following statement in his argument:

"Oh, Bill Boswell says that *if Jim McKinney could talk* he could say the railroad was not at fault. *I say to Bill Boswell, if Jim McKinney could lean over the battlements of heaven this minute,* he would point a finger of scorn at him for making any such statement like that to this jury. If he was, Gentlemen, with all good sense — here comes a truck 1000 feet away, going sixty miles an hour, and what did they do? They pulled that train out in front of him, when they knew that highway was wet according to their own testimony, and traveling at that rate of speed." (Italics ours).

The closing portion of the fifth qualification sets out an excerpt from Mr. Naman's argument, which is as follows:

"Without in any sense of being sacrilegious, but with the utmost respect to the memory of the man who is gone, *I do say that if he gazed down upon this scene from the battlements of high heaven,* he would put a restraint upon the attorneys who charge that Keith, and Moody, and Williams, and Hall, and Joins were to blame for the life of Jim McKinney — men that were so closely tied to him, *that it grieved them beyong expression to even view his lifeless form."* (Italics ours).

Upon careful consideration of the lengthy record relating to the two arguments (the transcript record alone covering eighteen pages) we have concluded that the holdings of the Court of Civil Appeals to the effect they were not an appeal to prejudice or bias, and were in part invited by the argument of counsel for defendants, are correct, and supported by the cases cited. See opinion, 126 S. W. (2d) 792, 2nd col.; also McFadden Pub. Co. v. Wilson (wr. ref.), 121 S. W. (2d) 430; Texas & P. Ry. Co. v. Smith, (wr. dis.), 115 S. W. (2d) 1238.

As stated in Rio Grande, E. P. & S. F. R. Co. v. Dupree (Com. App.), 55 S. W. (2d) 522, "we think the argument is not of such a character as would be calculated to cause the jury to forget their oaths and duties, and return a verdict regardless of the facts and the law. Under our system lawyers are allowed

some latitude to engage in oratory." The record discloses that counsel for both plaintiffs and defendants "took some latitude" in the present case to do just that. Furthermore, the trial court sustained objection to the second statement with respect to the railroad corporation's using the life of McKinney for nineteen years and leaving the wife cold with two orphan children and instructed the jury not to consider it. There was no reversible error.

The Court of Civil Appeals did not err in affirming the trial court's action in overruling the railroad company's motion non obstante. Its judgment affirming that of the trial court is affirmed.

Opinion adopted by the Supreme Court January 1, 1941.

Rehearing overruled February 5, 1941.