**Linda RICHARDS and Dorothy Richards,**
**Plaintiffs-Appellees,**

v.

**SOUTHERN PACIFIC**
**TRANSPORTATION,**
**Defendant-Appellant.**

No. 80–2240.

United States Court of Appeals,
Fifth Circuit.*
Unit A

Jan. 20, 1982.

Rehearing Denied Feb. 22, 1982.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Matthews, Nowlin, MacFarlane & Barrett, Ferd C. Meyer, Jr., San Antonio, Tex., for defendant-appellant.

Byrd, Davis & Eisenberg, Mike Davis, Austin, Tex., for plaintiffs-appellees.

Before RUBIN, RANDALL and TATE, Circuit Judges.

RANDALL, Circuit Judge:

At approximately 11:50 p. m., on November 25, 1977, a car driven by Owen Richards ran into the side of a Southern Pacific Transportation Company (Southern Pacific) train which was crossing the access road on which Richards was driving. Richards died several hours later from injuries sustained in the collision. Alleging that the collision resulting in Richards' death was directly and proximately caused by the negligence of Southern Pacific employees, Richards' wife and mother (plaintiffs) brought an action against Southern Pacific, under the Texas Survival Act, Tex.Rev.Civ.Stat.Ann. art. 5525 (Vernon), and the Texas Wrongful Death Act, Tex.Rev.Civ.Stat.Ann. art. 4671 (Vernon). Jurisdiction was predicated on diversity of citizenship. 28 U.S.C. § 1332. The trial court held Southern Pacific liable for failing to put flares on the access road to warn of the presence of the train. Because we conclude that plaintiffs failed to establish that Southern Pacific had a duty, under Texas law, to put flares on the access road, we reverse the judgment of the trial court.

I. *Statements of Facts.*

Richards was proceeding north on the north-bound access road to Interstate Highway 10 (I.H. 10). The Southern Pacific train, consisting of three engines and seven loaded air dump cars, was transporting rock products from a McDonough Brothers gravel pit on the west side of the highway to a McDonough Brothers plant north-east of the highway. The record indicates that the tracks on which the train was operating cross the access road from under the highway to the west of the access road and then turn north on the east side of the access road. At the time of the collision, the second air dump car of the train was upon the highway; the three engines, which were leading the loaded air dump cars, were rounding the curve to the east of the access road and were headed the same general direction in which Richards was traveling. Richards' car struck the second air dump car of the train.

The trial court found that the train's only lights and warning signals were on the engines, which were approximately 210 feet beyond the scene of the collision, and that there were no flares on the roadway. The record further indicates that along the highway access road there were the following warning devices: (1) a black and yellow advance warning sign, facing northbound traffic, approximately 400 feet south of the crossing; (2) a fifty-two foot warning sign, painted on the surface of the access road, approximately 270 feet south of the crossing; and (3) standard reflectorized railroad crosstrack signs, facing oncoming traffic, just before the crossing. There was no form of artificial illumination at the crossing.

The trial court, in a non-jury trial, entered a judgment for Linda Richards in the amount of $180,000 and for Dorothy Richards in the amount of $30,000 on the basis of the following findings of fact:

(1) The railroad crossing involved was an extrahazardous one.

(2) Immediately prior to the accident made the basis of this suit, defendant's

employees failed to place flares on the I.H. 10 access road to warn oncoming traffic of the presence of a train across the highway.

(3) The failure of the defendant's employees to place flares on the roadway constitutes negligence for which the defendant is legally responsible.

(4) The negligence of defendant's employees in failing to place flares upon the roadway was a direct and proximate cause of the accident made the basis of this suit.

(5) On the occasion in question, the decedent was a proximate cause of the accident and of his death.

(6) The negligence of the decedent was a proximate cause of the accident and of his death.

(7) As a direct and proximate result of the death of Owen Clifford Richards, plaintiffs have sustained the following damages:

(a) Lynda Richards, for the care, maintenance, support, services, advice, counsel and contributions of a pecuniary value that she would have received from her husband during her lifetime had he lived—$300,000.

(b) Dorothy Richards, for the kindness, services, comfort, and attention that in reasonable probability she would have received from her son during her lifetime—$50,000.

(8) The percentage of the negligence that caused the occurrence to be attributable to each found to be negligent is:

| (a) | The defendant | 60% |
| (b) | The decedent | 40% |

Although the trial court's findings do not state the basis on which it found Richards contributorily negligent, there was evidence in the record that Richards had been drinking, that he may have been driving at a speed greater than the posted speed limit, and that, because of his position as McDo-

nough Brothers' liaison with Southern Pacific, he was well aware that the train would be operating at the crossing on the night of the collision.

## II. *The Trial Court's Finding That The Crossing Was Extrahazardous.*

Arguing that under Texas law there is no duty to provide extraordinary warnings that a train is occupying a crossing unless the crossing is "extrahazardous," Southern Pacific contends that the trial court erred in its findings that the railroad crossing involved in this case was extrahazardous, that the failure of Southern Pacific's employees to place flares on the roadway constitutes negligence for which Southern Pacific is legally responsible and that the negligence of Southern Pacific's employees in failing to place flares upon the roadway was a direct and proximate cause of the accident made the basis of this suit.[1]

In *Fitch v. Missouri-Kansas-Texas Transportation Co.*, 441 F.2d 1, 2 (5th Cir. 1971), we summarized the Texas law with respect to the duty owed by a railroad to motorists approaching one of its crossings as follows:

Though every railroad crossing is tinged with danger, the common law and statutory duty of a railroad in Texas with respect to an *ordinary* crossing is simply to provide and maintain thereat one crossing sign " * * * with large and distinct letters placed thereon, to give notice of the proximity of the railroad and warn persons of the necessity of looking out for the cars." Tex.Rev.Civ.Stat.Ann. art. 6370 (1926); *Karr v. Panhandle & S.F. Ry.*, 153 Tex. 25, 262 S.W.2d 925 (1953); *Muniz v. Panhandle & S. F. Ry.*, 285 S.W.2d 809 (Tex.Civ.App.—Amarillo 1955, writ ref'd n.r.e.). With respect to an "extra hazardous" crossing, however, it is incumbent upon a railroad company to provide extraordinary means such as lights or signal bells to warn persons ap-

---

1. Southern Pacific also contends that the trial court erred in its finding that Southern Pacific employees failed to place flares on the access road to warn oncoming traffic of the presence of the train across the highway. Because we conclude that plaintiffs failed to establish that Southern Pacific had a duty to place such flares on the roadway, it is not necessary for us to address the trial court's finding that Southern Pacific failed to do so.

proaching its crossing or intersection. *See, e.g., Fort Worth & D. Ry. Co. v. Williams,* 375 S.W.2d 279 ([Tex.]1964); *Texas & N. O. Ry. v. Compton,* [135 Tex. 7] 136 S.W.2d 1113 (1940); *Muniz v. Panhandle & S. F. Ry., supra; Lundberg v. Missouri-K. T. Ry.,* 232 S.W.2d 879 (Tex. Civ.App.—Waco 1950, writ ref'd n.r.e.); *St. Louis Southwestern Ry. v. Barr,* 148 S.W.2d 924 (Tex.Civ.App.—Dallas 1940, writ dism'd jdgmt. cor.); *Thompson v. St. Louis Southwestern Ry.,* 55 S.W.2d 1084 (Tex.Civ.App.—Texarkana 1932, no writ). A railroad crossing is characterized as extrahazardous under Texas law when it is so perilous that prudent persons, in the exercise of ordinary care, cannot use it with safety in the absence of extraordinary warning devices. *See, e.g., Texas & N. O. Ry. v. Compton, supra; Muniz v. Panhandle & S. F. Ry., supra.* Since the degree of danger associated with a crossing is not constant but varies with the concurrent circumstances, "[w]hether or not any given set of facts describing the surroundings of any particular crossing are such as to mark such crossing as one attended with unusual danger or extraordinary hazard is a question solely for the determination of the jury, unless only one conclusion could be drawn therefrom by all reasonable minds." *Fort Worth & D. Ry. v. Williams, supra,* 375 S.W.2d at 283; *Missouri–K–T Ry. v. Wagner,* 400 S.W.2d 357, 360 (Tex.Civ.App.—Waco 1966, writ ref'd n.r.e.).

We remanded that case for a new trial, where the trial court failed to indicate to the jury the relationship between an extrahazardous crossing and the duty to employ extraordinary means to give warning, stating:

It is apparent from the summary of Texas law with which we began this discussion that a finding that M–K–T failed to provide extraordinary warning precautions is simply without legal consequence in the absence of a specific finding that the crossing in question was an extrahazardous one. The relationship between an

extrahazardous crossing and the attendant duty to employ extraordinary means to give warning is central to a proper determination of the instant case.

*Id.* at 4.

In *Fitch,* an automobile collided with the lead gondola car of a train, *id.* at 2, the automobile and the train apparently having arrived at the crossing at substantially the same time. In 1978, the Texas Supreme Court applied the doctrines summarized in *Fitch* to a case in which, as in the present case, "a car [ran] into the side of a train that had already reached and was occupying the crossing." *Missouri Pacific Railroad Co. v. Cooper,* 563 S.W.2d 233, 235 (Tex. 1978). "There was a light beam on the front engine which at the time of the accident was already about three fourths of a mile south of the crossing, and there was a light on the caboose. There were no other lights between the front and back of the train . . . . The weather at the time of the collision was foggy and damp." *Id.* at 234. As in this case, a driver approaching the crossing was confronted by "[a] large "X" with an "R" on each side" "painted on the surface of the highway," "the usual yellow round metal sign that also had an "X" with an "R" on either side," and "the familiar cross buck sign with two crossing boards erected on a white pole." *Id.* The court in *Cooper* stated:

The warning signs that were located along the highway were adequate warnings for the dangers of an ordinary rural crossing. Every railroad crossing is dangerous, but it is only crossings which are found to be extra hazardous that place the higher duty on the railroad to use extraordinary means to warn travelers along the road.

*Id.* at 235 (citations omitted). Concluding that there was no evidence which supported the jury finding that the crossing was extrahazardous, the court reversed the lower court judgment and rendered judgment that the plaintiffs take nothing. *Id.* at 238.[2]

---

**2.** Plaintiff's attempt to distinguish *Cooper* on two bases: (1) that trains passed over the

crossing involved in *Cooper* at high speeds,

In the present case, as in *Cooper*, then, "[t]he central question in this appeal is whether there is any evidence which supports the jury finding that the crossing was extrahazardous, upon which finding the duty to provide the additional warning device is grounded." *Id.* at 235. *See also, e.g., Texas & N. O. R. Co. v. Compton*, 136 S.W.2d 1113 (Tex.1940); *Missouri-Kansas-Texas Railroad Co. v. Bernhardt*, 418 S.W.2d 368 (Tex.Civ.App.—Austin 1967, writ ref'd n.r.e.); *Missouri-Kansas-Texas Railroad Co. v. Wagner*, 400 S.W.2d 357 (Tex.Civ.App.—Waco 1966, writ ref'd n.r.e.); *Panhandle & Santa Fe Railway Co. v. Liscomb*, 365 S.W.2d 190 (Tex.Civ.App.—El Paso 1963, writ ref'd n.r.e.).

As indicated in *Fitch, supra*, plaintiffs are correct that whether a crossing is extrahazardous at a particular time is a fact question and "necessarily depends upon the facts of each case." *Fort Worth and Denver Railway Co. v. Williams*, 375 S.W.2d 279, 283 (Tex.1964). Nevertheless, *Cooper* makes it clear that where there is no evidence which supports the finding that the crossing is extrahazardous, judgment must be rendered for the railroad. *Cf. Fitch, supra*, (remanding for a new trial where "the evidence adduced at trial regarding the physical conditions associated with the crossing at the time of the accident was clearly sufficient to raise the question of extrahazardous crossing," 441 F.2d at 3.).

Both before the trial court and on appeal, Southern Pacific has relied on a long line of Texas cases, headed by *Texas & N. O. R. Co. v. Stratton*, 74 S.W.2d 741 (Tex.Civ.App.—San Antonio 1934, writ ref'd), for the proposition that darkness and the presence of the train upon the crossing do not in themselves render the crossing extrahazardous. The Texas Supreme Court has cited these cases for the proposition that "the presence of a train on a crossing blocking a public highway does not in itself constitute an extra hazardous crossing," *Fort Worth & Denver Railway Co. v. Williams*, 375 S.W.2d 279, 283 (Tex.1964); and, in fact, that the presence of railroad cars that are already occupying the crossing and directly in front of the driver are "[a]n additional warning of danger to those proceeding toward the railroad crossing." *Cooper, supra*, at 235. Thus, the issue in a case such as this has been alternatively stated as whether "the operatives of the train could reasonably have assumed that, due to the peculiar condition, the lawful presence of the train across the highway was not sufficient to warn travelers approaching the crossing in a careful manner." *Texas & N. O. R. Co. v. Adams*, 27 S.W.2d 331, 334 (Tex.Civ.App.—Beaumont 1930, writ dism'd w. o. j.). These cases also establish that "[i]f the night is dark and foggy and visibility is bad, these additional conditions will not, even when coupled with the presence of the train, make the crossing an extrahazardous nighttime crossing." *Missouri-Kansas-Texas Railroad Co. v. Bernhardt*, 418 S.W.2d 368, 374 (Tex.Civ.App.—Austin 1967, writ ref'd n.r.e.). This is because the railroad may assume that the reasonable traveler will limit his speed in consideration of these conditions also, according to the strength of his own headlights, so as to avoid *any* obstructions with which he may be confronted, of which a slow-moving train occupying a crossing is only one possibility. *See Stratton, supra*, at 743, 748.[3]

clearing the crossing quickly, and (2) that there was no evidence in *Cooper* that the crossing was anything more than an ordinary rural crossing, whereas the railroad and crew were aware that the crossing in the present case was extrahazardous. Although the train in *Cooper* was moving at forty-five miles an hour, it also consisted of 113 cars, a caboose and four engines. *Cooper, supra*, at 234. There is no evidence that the train in *Cooper* cleared the crossing more quickly than the train in the present case, nor have plaintiffs established that if that were the case, the result should be

any different. As for the awareness of the railroad and crew that the crossing was extrahazardous, we hold *infra* that the evidence failed to prove such an awareness.

3. Plaintiffs attempt to distinguish *Stratton*, as *Cooper*, on the basis that the train was not being operated in violation of a company rule where the railroad and crew knew that the crossing was extrahazardous. Again our holding, *infra*, that the same is true of the present case negates this distinction. Plaintiffs also point to the fact that the crossing in *Stratton*

The trial court found the cases cited by Southern Pacific inapposite, believing that in this case there was much more than darkness and/or fog to support the finding that the crossing was extrahazardous. The trial court did not, however, specify to what evidence it was referring. In its memorandum, the trial court cited testimony that Southern Pacific had posted instructions that no trains were to be pushed across the crossing at night, without flares being placed on the roadway, as evidence that the railroad recognized the inherent danger of the crossing at night when the train is "moving blind." The court reasoned that, because of the physical configuration of the crossing, "the cars on the train were blindly moving forward over the access road without flares to the same extent that they may have blindly backed up over the same crossing earlier without flares, thus making the crossing extrahazardous on both occasions."

We recognize that Texas courts have held that a violation of the railroad's own rule or standard procedure is admissible as evidence on the question of negligence. *Texas & Pacific Railway Co. v. Hastings*, 282 S.W.2d 758 (Tex.Civ.App.—El Paso 1955, writ ref'd n.r.e.); *Barron v. Houston E. & W. T. Ry. Co.*, 249 S.W. 825 (Tex. Comm.App.1923). *See also Young v. Illinois Central Gulf Railroad Co.*, 618 F.2d 332, 339 (5th Cir. 1980). Nevertheless, we do not believe that the evidence in this case supports the conclusion that the railroad rule or practice evidenced recognition of a need for flares *while a train was occupying the crossing*, as was the case here. The evidence on this issue consisted of the testimony of three of the trainmen—two brakemen and the conductor. The two brakemen testified that they were not aware of any instructions to use flares, but that they did in fact use them.[4] Conductor Lewis testified that "a terminal superintendent" had at some time given him a message that "no trains were to be pushed across this crossing at night in the dark without flares being placed on the highway." This testimony, the only evidence presented by plaintiffs to support its contention that the railroad had a policy to use flares, indicates only that there may have been such a policy when trains were "to be pushed across" the crossing. There is no testimony that the railroad had a rule that flares were to be used whenever trains "occupied" the crossing at night.[5] The trial court itself recognized that the crossing was equally dark while occupied by a train whether the train was being pulled across or pushed across. Thus it makes no sense that if the railroad recognized a need for flares whenever trains *occupied* the track it would issue a directive specifying only that flares be used when trains were to be pushed across the track. The fact that the directive specified that flares were to be used when trains were to be "pushed across" the crossing, therefore, indicates that the reason was not the danger which might exist while the train is occupying the crossing, but instead while the train is approaching the crossing without the benefit of a lead engine light. This interpretation is further supported by the testimony of Brakeman Dresch that if flares placed in the roadway upon proceeding to push a train across the crossing were to burn out while the train was still passing over the crossing, additional flares would

---

was a rural track which was used infrequently. Although this distinction has been made in some of the cases, plaintiffs have not shown that the track in this case was so used as to result in the presence of the train being an insufficient warning to cautious travelers.

4. They testified that they normally used flares at night as a safety measure because of darkness. Their testimony that it might be safer to operate at the crossing with flares and that they often did so did not evidence a need for flares at this particular crossing to warn approaching travelers of a train blocking the road

or that it was a standard procedure to use flares under those circumstances. Brakeman Dresch, in fact, testified that if the flares burned out while the train was still on the tracks, new flares were not put out.

5. Although Conductor Lewis later stated that the reason for the rule may have been the fact that they were "switching" trains at night, this does not alter his testimony that the circumstance under which flares were to be used in these switching operations was where trains were to be pushed across the tracks.

not be lit. We believe that the only reasonable interpretation of the evidence is that flares were used to light up the crossing as a train approached without the benefit of engine lights illuminating the crossing. Even accepting that the railroad had such a policy, this was not evidence that flares were needed when a train was being pulled across, in which case the approach was illuminated by the engine lights, or, more importantly, when a train was occupying the crossing, in which case the presence of the train itself was a warning to ordinarily cautious drivers approaching the crossing.[6]

 Nothing in the evidence supports the conclusion that the crossing was extrahazardous while being occupied by a train. Whether a crossing is extrahazardous depends on the circumstances at the time of the collision. *Fort Worth & Denver Railway Co. v. Williams*, 375 S.W.2d 279 (Tex. 1964); *Karr v. Panhandle & Santa Fe Railway Co.*, 262 S.W.2d 925 (Tex.1953); *Tisdale v. Panhandle & S. F. Ry. Co.*, 228 S.W. 133 (Tex.Comm.App.1921, holdings approved). There was no evidence which indicated, and plaintiffs do not contend, that a driver's view of the train upon the crossing in question was in any way obstructed, or that the condition of the crossing was such as to give the impression that the crossing was unoccupied, *see, e.g., Fort Worth & Denver Railway Co. v. Williams*, 375 S.W.2d 279 (Tex. 1964); *Texas & N. O. R. Co. v. Davis*, 210 S.W.2d 195 (Tex.Civ.App.—Beaumont 1948, writ ref'd n.r.e.); *Texas City Terminal Ry. Co. v. Allen*, 181 S.W.2d 727 (Tex.Civ.App. —Galveston 1944, writ ref'd). Neither was there evidence of prior accidents at the crossing under substantially similar circumstances. *See, e.g., Missouri Pacific Railroad Co. v. Thomas*, 579 S.W.2d 46 (Tex.Civ.App. —Beaumont 1979, writ ref'd n.r.e.).

In *Cooper*, the Texas Supreme Court found as a matter of law that the crossing was not extrahazardous despite the fact that the light beam on the front of the train was, at the time of the accident, "already about three-fourths of a mile south of the crossing." *Cooper, supra*, at 234. In reviewing testimony as to whether the view of the crossing was obstructed, the court was careful to note: "This is not a case of an approaching train and a car that collide at a crossing; it is that of a car running into the side of a train that had already reached and was occupying the crossing."[7] *Cooper, supra*, at 235 (citations omitted). In another case in which a car ran into a train which was occupying a crossing, the Galveston Court of Civil Appeals stated:

The evidence tendered by plaintiffs to show that the crossing was extrahazardous by reason of the brush, houses, and fence, which would obscure the view of a train approaching the crossing, was irrelevant, due to the fact that the road was here straight, and no hazard was created by reason of an approaching train of cars.

*Reid v. Texas & New Orleans R. Co.*, 254 S.W.2d 164, 167 (Tex.Civ.App.—Galveston 1952, writ ref'd n.r.e.). *See also, Texas City Terminal Railway Co. v. Blaha*, 502 S.W.2d 204, 208 (Tex.Civ.App.—Houston 1973, no writ). Thus, whereas the facts that the railroad tracks come from under the highway to the west of the access road and run parallel to the highway to the east of the

---

6. We note that several jurisdictions in the United States hold that a plaintiff is not guilty of contributory negligence where he relied on the custom of the railroad. Annot. 84 A.L.R.2d 813, 883 (1962). Because we conclude that the evidence presented fails to show that the railroad custom was to have flares burning at all times during which the crossing was occupied by a train, we need not consider the possibility that, in his intimate knowledge of the crossing, Richards may have been relying on the absence of flares to assume that the crossing was unoccupied or the reasonableness or legal consequences of such reliance.

7. At no time have plaintiffs contended that the train had not been occupying the crossing long enough for its presence to provide a warning to reasonably cautious drivers that the crossing was occupied. This would be a different case, we believe, if, although technically the car ran into the side of the train, that were so merely because part of an approaching train happened to beat the car across the intersection. *See, e.g., Missouri K. & T. R. Co. of Texas v. McKinney*, 136 Tex. 75, 145 S.W.2d 1081 (1941) (train, racing to beat truck across highway, did not make it.) *See* Part III, *infra*.

access road might indicate that the crossing is extrahazardous with respect to a train approaching the crossing, there is nothing in the evidence to indicate that a driver's view of a train blocking the road was in any way obstructed, and thus that the presence of the train across the road was not a sufficient warning of that danger. The trial court therefore erred in holding Southern Pacific liable for failing to put out flares; because the crossing was not an "extrahazardous" nighttime crossing, Southern Pacific had no duty to employ extraordinary warnings such as flares.

III. *Liability Absent a Finding That The Crossing Is Extrahazardous.*

Plaintiffs contend that the failure to put out flares supported the judgment even if the crossing was not extrahazardous. They cite *Missouri, K. & T. R. Co. v. McKinney*, 136 Tex. 75, 145 S.W.2d 1081 (1941), and, in a supplemental letter, refer us to the recent case of *Missouri Pacific Railroad Co. v. Shaw*, 620 S.W.2d 161 (Tex.Civ.App.—Corpus Christi 1981). We do not believe that these cases, or the cases cited by these cases, support the proposition that a railroad may be liable for failing to employ extraordinary warning signals where a crossing occupied by a train is not extrahazardous.

The *McKinney* case, relied on by plaintiffs, clearly states:

[I]n view of [the crossing's status as not more than ordinarily hazardous] it followed as a matter of law, as held by the Court of Civil Appeals, that the railroad company was not negligent in not maintaining a light, or other signal, "at the intersection of a highway and a spur track only used occasionally."

145 S.W.2d at 1085. Admittedly, the *McKinney* court found the railroad operatives negligent in their switching movement at the crossing whether or not the crossing was more than ordinarily hazardous. *Id.* 145 S.W.2d at 1086. The negligence involved in *McKinney*, however, was not a failure to employ extraordinary warnings that a train was lawfully obstructing an intersection; it was the movement of the train "upon and across the intersection negligently." *Id.* 145 S.W.2d at 1085. In *McKinney*, the railroad employees gave the "go-ahead" signal for the train, which was stopped at the edge of the highway, to attempt to cross the highway, despite seeing the approaching truck. *Id.* The *McKinney* court distinguished *Stratton* and *Compton* on precisely those facts, stating:

In the Compton case the employees operating the train did not see and could not have seen, before entering upon the crossing, the automobile which collided with the train, which was 87 cars in length. . . . In the Stratton case . . . [t]here is no evidence that the train operatives saw, or were negligent in not seeing, the automobile before the train approached and went upon the crossing.

In the *Shaw* case, a Texas appeals court rejected an appellant's contention that in the absence of a finding of extrahazardous crossing which would impose upon the appellant a duty to warn, no liability may be imposed upon appellant because appellant has done everything it was required to do by law. The negligence there was the failure of the railroad to give necessary adequate warnings to the driver that it was about to operate its train backward; it was not the failure to employ extraordinary warnings of a train occupying a crossing where the train itself was sufficient warning of its presence. We do not believe that the cases cited in *Shaw* support the proposition that a railroad may be liable for failing to employ extraordinary warning signals where a crossing occupied by a train is not extrahazardous.[8]

---

8. In *Rio Grande, E.P. & S.F.R. Co. v. Dupree*, 55 S.W.2d 522 (Tex.Com.App.1932, judgment adopted), the train and truck collided when they arrived at the crossing at substantially the same time. The railroad's negligence was not an issue on appeal, *id.* at 525, and in fact the recital of facts included the "unusually dangerous" character of the crossing at the time of the accident, *id.* at 524. In *Fort Worth & Denver Ry. Co. v. Ferguson*, 261 S.W.2d 874 (Tex. Civ.App.—Ft. Worth 1953, writ dism'd w.o.j.), it was again the railroad that ran into the

■ The cases cited in Part II above make it clear that under Texas law a railroad can only be liable for failing to employ extraordinary warning devices when the crossing is proven to be extrahazardous. We do not suggest that negligence may not be predicated on acts or omissions of railroads other than the failure to employ extraordinary warnings of a train occupying a crossing, as in the cases cited by plaintiffs. Nevertheless, negligence may only be predicated on a failure to employ extraordinary warning signals to warn of a train lawfully occupying a crossing where the crossing involved is found to have been extrahazardous at the time of the collision.

At oral argument, plaintiffs raised the additional argument that the *Stratton* line of cases was based on the old contributory negligence system and is thus no longer valid under the modified comparative negligence system adopted by Texas in 1973. Tex.Rev.Civ.Stat.Ann. art. 2212a (Vernon Supp. 1980–1981). They point out that, although *Cooper, supra,* was decided by the Texas Supreme Court in 1978, it involved a cause of action which arose in 1969, and that art. 2212a applies only to causes of action arising after September 1, 1973. In *B&B Auto Supply, Sand Pit, and Trucking Co. v. Central Freight Lines, Inc.,* 603 S.W.2d 814 (Tex.1980), the Texas Supreme Court stated:

Since the enactment of art. 2212a we have sought to abolish doctrines directed to the old choice of total victory and total defeat. . . . The policy underlying these decisions and the enactment of art. 2212a was to abolish traditional common law rules which required an all or nothing result and to return trials of negligence cases to tort concepts of negligence and comparative negligence.

*Id.* at 817 (citations omitted).

"In diversity cases *Erie* teaches us that where state law has been announced by the state's highest court—it is to be followed." *Bailey v. Southern Pacific Transportation Co.,* 613 F.2d 1385, 1388 (5th Cir.), *cert. denied,* 449 U.S. 836, 101 S.Ct. 109, 66 L.Ed.2d 42 (1980).

Even in the rare case where a course of Texas decisions permits us to extrapolate or predict with assurance where [Texas substantive law] would be had it been declared, we should perhaps—being out of the mainstream of Texas jurisprudential development—be more chary of doing so than should an inferior state tribunal.

*Rhynes v. Branick Manufacturing Corp.,* 629 F.2d 409, 410 (5th Cir.1980) (refusing to adopt the "product line rule" of liability for Texas). The Texas Supreme Court has affirmed the doctrines applied in this case, and we find no basis for concluding that if

automobile. The court upheld the lower court's denial of an instructed verdict upon the alleged failure to raise an issue as to the railroad's negligence only after reciting facts which included the obscured view of the track due to the presence of a building. In *Texas & N.O.R. v. Blake,* 175 S.W.2d 683 (Tex.Civ.App. —Ft. Worth 1943, writ ref'd), to which we assume the *Shaw* court was referring in citing "*Texas & N.O.R. Co. v. Brook, supra,*" it was again the train which ran into the truck. This case actually supports the proposition that a finding that the crossing was extrahazardous is essential to a finding of negligence predicated on a failure to employ extraordinary warning signals. A careful reading of this opinion shows that the court held that the issues of the railroad's negligence for failing to have a flagman or mechanical device at the crossing to warn the public of danger were immaterial due to the absence of testimony raising the issue of extrahazardous crossing. *Id.* at 687. In *Karr v. Panhandle & Santa Fe Ry. Co.,* 262 S.W.2d

925 (1953), the dissenters did state that they believed that the case should be remanded for trial under allegations of simple negligence despite agreeing that the crossing was extrahazardous. *Id.* at 932. The majority of the Texas Supreme Court obviously did not agree, however, and there is no indication, in this, another case involving an automobile struck by a train, that the negligence to which the dissenters were referring was a failure to employ extraordinary warning signals. Finally, the *Shaw* court quoted *Southwest Stone Co. v. Symons,* 237 S.W.2d 380 (Tex.Civ.App.—Ft. Worth 1951, writ ref'd n.r.e.), another case in which a truck was struck by a train. The quoted passage dealt with the railroad's act of pushing six cars ahead of an engine without sufficient light on the front car to warn of the approach of the train, *id.* at 386, only after the court had carefully distinguished its case from the cases in which a traveler collided with a train which already occupied the crossing at the time of the collision, *id.* at 384.

presented with this case today, the Texas Supreme Court would apply a different approach. The adoption of comparative negligence did not eliminate the element of legal duty from actionable negligence. *See Furr's Inc. v. Patterson*, 618 S.W.2d 417, 419 (Tex.Civ.App.—Amarillo 1981, no writ). Here we hold that Southern Pacific could not be liable for failing to employ extraordinary warnings because it had no legal duty to do so. Under the doctrines we have applied in this case, a plaintiff's contributory negligence is not an absolute bar to recovery, and thus the doctrines do not necessarily conflict with art. 2212a. We, therefore, refuse to presume that the Texas Supreme Court would not apply these same doctrines today.

### IV. *Conclusion.*

We conclude that there was insufficient evidence to support the trial court's finding that the crossing was extrahazardous at the time of the collision, and that, in the absence of such evidence, it was error to find Southern Pacific liable for failing to employ extraordinary means to warn of the presence of the train at the crossing. The judgment of the trial court is therefore REVERSED.

REVERSED.

TATE, Circuit Judge, dissenting:

I respectfully dissent. I am unable to find clearly erroneous the district court's determination that this crossing at issue was extrahazardous and thus required extra means of warning beyond the unilluminated fixed railroad warning signs by the side of the road—that concededly are not sufficient to warn night motorists that an *ultrahazardous* railroad crossing ahead may pose a not-to-be-anticipated death-dealing barrier across the roadway. In the case of an extraordinarily hazardous crossing, the oncoming night motorist in modern high-speed travel conditions is not negligent for failing to anticipate or to readily observe an obscured railway gondola across the tracks, in the absence of alerting lights, warning bells, or flashing signals.

The majority's analysis that dissects some aspects of the evidence, I respectfully suggest, fails to put into total context the extreme hazard to the traveling public created at night by this crossing. The railroad crossing was over an access road running north-south and parallel to a raised Interstate Highway. The train came out from the west under the Interstate Highway and then turned to the north on tracks paralleling the access road.

The hazardous nature of the crossing can be more clearly appreciated if we visualize a night motorist proceeding *south*ward on the access road: on the parallel tracks to his left, he could see the headlights on a northbound locomotive (the only lighted evidence of the presence of the train) drawing a line of gondolas several hundred feet in length; but he could not readily anticipate that the train on the tracks to his left curved rightward across his path several hundred feet to his front, in order to go under the Interstate embankment to his right that contra-indicated any railroad crossing. Extra warnings by way of flares would clearly be required to protect such a motorist, in my opinion. Likewise, although the extraordinary hazard is not so readily apparent, an oncoming *north*bound motorist (such as the plaintiff's decedent), using ordinary care, could not reasonably be expected to anticipate, without exceptional altering warning, that from under the embanked Interstate Highway to *his* left could emerge crossing tracks upon which an obscured and unilluminated line of railroad cars thus posed an extraordinary hazard to his safe passage of the highway. Under these circumstances, I certainly do not believe that a reviewing court can find clearly erroneous the district court's appreciation and finding that the crossing was extraordinarily hazardous at nighttime.

Here, furthermore, evidence credited by the district court was to the effect that the railroad company did in fact customarily place flares when using the crossing at night, thus recognizing the extraordinary hazard to the night motorist so created. If the plaintiff's decedent motorist was aware

that the railroad customarily flared the crossing when obstructed by its trains at nighttime, he was entitled to rely upon such customary warning.[1] Under well-settled principle, applying the presumption of ordinary care in favor of a decedent whom death has silenced from testifying in his own behalf, the district court was entitled to assume that the decedent relied upon this customary warning, which on this occasion was negligently not given.

I will conclude by quoting the findings of the distinguished and experienced trial judge. Before doing so, however, I must further note that I do not read the record as devoid of evidence supporting the trial judge's conclusions that, despite the railroad-favoring testimony of the three railroad-employee witnesses, the railroad did customarily place warning flares to alert oncoming night motorists of the extraordinary hazard posed by its nighttime railroad use.

The majority admits that two brakemen testified that they customarily did place such flares for safety reasons (although apparently the majority finds this evidence insufficient because they also testified that they were not aware of any *instructions* to use flares). In finding that there was no "policy" to put out flares, the majority construes the testimony of the third railroad witness, Conductor Lewis, as based upon instructions that flares were to be placed only when trains were *pushed* (backed) across the access road, not when they were *pulled*. While I believe it to be essentially immaterial to the issue (i.e., whether the district court was clearly erroneous in finding that the railroad customarily placed

warning flares when it used the crossing at night), as I read Conductor Lewis's testimony, Tr. 140–42, it can be read as admitting at one point that "[p]robably Mr. Stover [the terminal superintendent] wanted flares on the crossing due to the fact we were switching cars at night," Tr. 141, and ordering the flares placed "due to the fact of working after hours of darkness," Tr. 142. I am unable to find clearly erroneous the district court's factual inference drawn from this testimony that the railroad customarily placed flares when using the crossing at night, due to the danger thereby created.

I therefore agree with the district court's findings and reasoning to the effect that the extrahazardous nature of the crossing required extra warnings, that some were customarily given by flares, and that on the occasion of the decedent's death the railroad had negligently failed to afford such additional warning. As the district court stated:

Defendant's counsel has conceded during oral argument that if the train had been backing across the track, and there had been no flares thrown, his client would be responsible, because "at that point the train, for all practical purposes, is moving blind." But he reminds us that the accident did not occur this way, and argues that "once the train begins to move out pulling cars, nose up, headlight going, whistle and bell in front, . . . there's nothing about this crossing that is any more hazardous than any other crossing."

At this point, it is appropriate to look at the facts in this case. When the accident

---

1. *See* Restatement of Torts, 2d, Section 301(2), Comment (1965):

> *Duty to continue customary warning.* The actor may customarily adopt a method of giving warning which is in excess of that which a reasonable man would regard as necessary. By so doing, he may cause those likely to be affected by his act to rely upon the continuance of such warnings and to regard their absence as an assurance of safety. If the situation is such that the actor should realize that this is the case, he cannot discontinue this practice without exercising reasonable care to give warning thereof, although

he thereafter does all that would otherwise be reasonably necessary. Thus a railway company may station a watchman or install safety gates or automatic signals at a crossing over which the traffic is not so heavy as to require such precautions. Having led the traveling public to regard the failure of the watchman to wave his flag as an assurance that the track is clear, the company cannot discontinue the watchman without reasonable notice. So too, it must keep safety gates or signals in working order until they are removed or reasonable notice of their abandonment is given.

occurred the three engines had already crossed the access road, were rounding a curve, and were headed the same general direction in which the deceased was traveling. The train's only lights and warning signals were on the engines, which were approximately 210 feet away from the scene of the collision, and there were no flares on the roadway. There were no lights on the dump cars, and there was testimony to the effect that low beam headlights on an automobile traveling at the speed limit of 45 miles per hour would not provide a motorist sufficient time to stop before hitting the train. Since it is undisputed that the crossing was dark when the accident occurred, the cars on the train were blindly moving forward over the access road without flares to the same extent that they may have blindly backed up over the same crossing earlier without flares, thus making the crossing extrahazardous on both occasions.

But this is not all. The defendant itself, acting through a terminal superintendant, posted instructions that no trains were to be pushed across the crossing at night without flares being placed on the roadway, thus recognizing the inherent danger of the crossing at night when the train is "moving blind." In addition, two brakemen who regularly worked at the crossing agreed that it could not be safely used for switching cars at night without flares.

The defendant has relied upon a number of Texas cases which hold that darkness and/or fog alone do not create an extrahazardous crossing. However, those cases are inapposite, because, as we have seen, in this case there is more—much more, and, of course, each case rests upon its own facts. Here, the evidence fully supports the finding that the crossing was extrahazardous.